DINA BOELE, ADMINISTRATRIX AD PROSEQUENDUM OF THE GOODS AND CHATTELS OF ANTON M. BOELE, DECEASED, PLAINTIFF-APPELLEE, v. COLONIAL WESTERN AIRWAYS, INCORPORATED, DEFENDANT-APPELLANT.

MARY HENDERSON, ADMINISTRATRIX AD PROSEQUENDUM OF THE GOODS AND CHATTELS OF THOMAS J. HENDERSON, DECEASED, PLAINTIFF-APPELLEE, v. COLONIAL WESTERN AIRWAYS, INCORPORATED, DEFENDANT-APPELLANT.

Argued October 21, 1932—Decided January 31, 1933.

For the defendant-appellant, *McDermott, Enright & Carpenter (James D. Carpenter, Jr., and William Dike Reed).*

For the plaintiffs-respondents, *James A. Coolahan* and *William George.*

The opinion of the court was delivered by

Bodine, J. The plaintiffs in these actions, tried together by consent, recovered damages by reason of the death of their respective intestates in an airplane accident near the Newark

Airport on March 17th, 1929. The verdicts, rules reserving exceptions being granted, were reduced. The questions argued on the rules were: the verdicts were excessive and contrary to the weight of evidence and the charge of the court.

A case involving the falling of the same plane was before the Supreme Court on rule to show cause. *Ziser* v. *Colonial Western Airways, Inc.*, 10 *N. J. Mis. R.* 1118.

The plaintiffs' intestates purchased tickets for a trip from the Newark Airport around New York and return. The plane used was a Ford trimotor monoplane. The controls were held by pilot Lou Foote, who alone survived. The plane was licensed to carry twelve passengers, exclusive of crew, but on the flight in question fourteen passengers were carried, thirteen sitting in the cabin and one in the cockpit beside the pilot. At about five o'clock, the plane took off on its last flight and rose lazily, not gaining the altitude which had been reached on previous flights. The pilot gained an altitude of about one hundred and fifty feet, when he had gone about one thousand feet from the take-off, he turned sharply and continued with considerably increased speed down wind, gaining altitude. He then turned in the direction of New York. The plane then began to fall. Stretching before the path of the plane were factories, tall chimneys, railroad tracks and embankments, railroad cars and high tension wires. The plane was rapidly dropping and sank lower and lower. Foote tried to reach for the open country but failed, and the plane crashed on a steel railroad car loaded with sand. All the passengers in the cabin were instantly killed. The passenger seated in the cockpit beside the pilot died within twenty-four hours.

The trial judge charged the jury that the charge of negligence was based upon the failure and neglect of the defendant to exercise due and proper care in the operation, maintenance and control of the airplane in that it permitted (1) the motors and other parts of the plane to become defective, unsecured and insufficient; (2) that it failed to make a proper inspection of the plane before the plaintiff's intestates became passengers; (3) that it was negligent in employing and en-

gaging an incompetent and unskillful pilot or operator for the plane; and (4) in employing a pilot who was ignorant and unfamiliar with the landing field and other parts of the airport.

In the case of *Ziser* v. *Colonial Western Airways, Inc.,* 10 *N. J. Mis. R.* 1118, 1121, the Supreme Court said: "We think the jury were clearly entitled to take the case on the theory that there was negligence in entrusting the plane to a pilot new to the locality and unfamiliar with the terrain * * * and in loading the plane beyond the numerical limit set by the rules. The fact that Foote had managed to come safely through the three previous trips is of no particular significance."

The pilot testified that after he had made the turn and straightened out, going in an easterly direction towards New York the left motor quit cold just as if somebody shut off the switch or as if the motor was starved for gas; there was not anything there. He immediately opened up the remaining two motors again and the center motor started to lose r. p. m.'s—revved down. He could shove the throttle wide open on the center motor and it would quit and go lower. He pulled it back to about two-thirds back and it would start running again and by juggling the throttle back and forth he could keep the center motor turning about eight hundred and the right motor seemed perfectly all right, it revved up wide open about eighteen hundred. So, he continued on in that direction. He looked around for a place to "set down." There was not any place there, nothing but factories and buildings and wires and concrete viaduct there. It was too far away from the airport to go back into the airport and he noticed this place out ahead of him in a straight line of flying. * * * It looked like a big open meadow swamp at that time. He did not know whether it was a swamp now or not. The stuff he had to go over looked bad. He would not attempt to land an aeroplane in there. * * * It looked like dumps of brick, concrete and garbage and it was all burning and smoking. The first thing that he thought of was fire. He did not want to try to "set down" in there. He

might have tried to side slip and go down in there, but it did not look good. The best thing looked good to him was the open space out ahead of him, so he just headed for that space, and that is all he remembers, except wires.

One of the plaintiffs' witnesses had ridden in the plane in question on a previous trip. He testified that on that trip the plane seemed to drop a little and then go ahead and then drop some more, and the going was bumpy, although on the trip out the plane had seemed steady enough. His attention was directed by someone in the plane to the faulty action of the left motor. At least one, if not two witnesses to the take-off, testified to a sputtering of the motor, and that gusts of black smoke were emitted from the plane as though the engine was not firing properly. The pilot observed that the plane was not rising properly.

There was testimony that the spark plugs, or one of them, was defective and that none of them were properly constructed for a plane of that sort. There was testimony which, of course, was controverted, that the plane was overloaded. There was also testimony that the pilot had only made three flights in all from the airport that afternoon, and that his only opportunity to observe the locality was when he arrived the day before from the training school at Detroit, and had made a casual survey of the terrain as one could from an automobile.

The defendant, no doubt, proved that the plane had been properly serviced and inspected from the time of its purchase new from the Stout Metal Airplane Company. The chief pilot, Weatherdon, and the mechanic, Wtorkowski, so testified. The trial judge did not question the matter, but stressed, for the jury's consideration, the question of proper maintenance of the engines. Neither court nor jury could overlook the testimony thereon. On the next previous flight, the testimony indicated that the left engine had not worked well, and in the take-off the engines sputtered. The credit to attach to testimony is properly for the jury; and the trial court so charged the jury and cautioned them to search for the truth. There might be abundance of proof as to the

care and inspection of an automobile or an airplane, but its use after an opportunity to observe its defective operation, without adequate repair, would be some evidence of negligence. Perfect servicing and inspection of an airplane is no answer to the suggestion that the pilot, if he had observed, must have known of the faulty operation of its engines before he made his fatal flight. It was certainly for the jury to say whether those who testified to faulty operation and sputtering of the engine had made truthful and proper observation of the facts they recited. Proper instructions, we think, were given in these cases.

It is nowhere suggested that the plane was insufficiently fueled. Nor do we think there was any serious contention that the sharp turns were the cause of the occurrence. Suffice it to say, that the controls upon a plane must be capable of making reasonably safe banks and turns. Nor was there any question of the capacity of the pilot to make the flight. He was a licensed and qualified pilot as the jury was charged. The credit to attach to the testimony of the lay and expert witnesses was for the jury. The conflicting testimony as to the construction and condition of the spark plugs was for the jury, and the rulings of the court upon the rules to show cause upon the weight of evidence, precludes us from a consideration of the matters so settled. *Catterall* v. *Otis Elevator Co.*, 103 *N. J. L.* 381; *Boniewsky* v. *Polish Home, Ibid.* 323; *Noonan* v. *Great Atlantic and Pacific Tea Co.*, 104 *Id.* 136; *Cleaves* v. *Yeskel, Ibid.* 497; *Overend* v. *Kiernan*, 105 *Id.* 112; *Shaw* v. *Vermont Marble Co.*, 107 *Id.* 154; *Freschi* v. *Mason*, 108 *Id.* 272.

The case comes before us on the failure of the trial court to charge defendant's third, fourth, eighth, tenth and nineteenth requests. The third and fourth are as follows: "3. There is no evidence that the airplane in question was not properly inspected and properly serviced and cared for on and prior to March 17th, 1929. 4. There is positive evidence in this case that the airplane in question was properly serviced and properly inspected and cared for on and prior to March 17th, 1929."

The court said: "Well, now, there is no evidence in this case, gentlemen, that I recall, that the plane, exclusive of the machinery and mechanism, was not in proper condition. * * * How about the engines and mechanism of the plane? * * * Now, gentlemen, I have not paid, nor am I going to pay, much attention to those rules, because Captain Weatherdon, who was the flight superintendent or superintendent in charge of the pilots here, says that from a superficial examination the engines were in perfect condition. Mr. Wtorkowski, the mechanic who was with this plane for months before this accident happened, testified that he complied with those regulations and gave the line inspection and the one-hundred-hour inspection. In fact, he says that the one-hundred-hour inspection was given every twenty hours and a number of other witnesses were brought here who saw him working on the plane or helped him while he was working on the plane, and I do not recall any testimony here to show that the inspections were not actually made."

It occurs to us that the requests to charge were substantially covered by the trial court.

"It is elementary that all that the trial judge is required to do in dealing with such requests, when the legal principles embodied therein are sound, and are applicable to the matter under discussion, is to charge the substance thereof." *Grybowski* v. *Erie Railroad Co.*, 88 *N. J. L.* 1, 6; *affirmed*, 89 *Id.* 361.

The eighth, tenth and nineteenth requests to charge were, we think, properly refused but whether they were is immaterial for a proper disposition of this case. The eighth and tenth were requests that there was no evidence that the occurrence was due to the negligence of the defendant. The nineteenth, a request that there was no proof that defendant's negligence was the proximate cause of the occurrence. On the rules to show cause, defendant's counsel argued the weight of evidence and that the verdict was contrary to the charge of the court. The appellant having argued those matters cannot now ask us to reverse the verdicts on the ground that there was no evidence that defendant's negligence was the proximate cause of the occurrence.

Mr. Justice Trenchard said, in *Catterall* v. *Otis Elevator Co.*, 103 *N. J. L.* 381, 382: "The Supreme Court held rightly in *Ashhurst* v. *Atlantic Coast Electric Railroad Co.*, 66 *N. J. L.* 16, that a reason assigned for a new trial that the verdict is contrary to the weight of the evidence is necessarily embraced within exceptions to the refusal to nonsuit and to direct a verdict on the ground that there was no evidence of defendant's negligence and that contributory negligence of the plaintiff conclusively appeared, which were the exceptions reserved in the rule to show cause in the present case and now assigned as grounds of appeal in this court. That case was followed by the Supreme Court in *Holler* v. *Ross*, 67 *Id.* 60, where the last mentioned principle was restated, and where it was said that the reason therefor is plain, namely, that where all the evidence in a cause is involved in a motion to take the case from the jury it would be impossible to determine that the verdict was not contrary to the weight of the evidence, without necessarily determining that the refusal of the motion was right."

Defendant's counsel may not argue the weight of evidence on a rule to show cause and reserve an exception to a refusal to charge which, if granted, would have taken the case from the jury on the ground that there was no proof of defendant's negligence being the proximate cause of the occurrence.

The judgments below are affirmed.

*For affirmance*—TRENCHARD, PARKER, LLOYD, CASE, BODINE, DONGES, BROGAN, KAYS, HETFIELD, WELLS, KERNEY, JJ. 11.

*For reversal*—None.