Winfred Scarborough, appellee, v. Aeroservice, Inc., a corporation, et al., appellants.

53 N. W. 2d 902

Filed June 6, 1952.   No. 33130.

*Morsman, Maxwell, Fike & Sawtell,* for appellants.

*Wear & Boland, Davis & Pittman,* and *Robert D. Mullin,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is a law action brought by Winfred Scarborough as plaintiff against Aeroservice, Inc., a corporation, and Harold H. Honeywell, defendants, in the district court for Douglas County to recover damages for injuries sustained by the plaintiff when the airplane in which he was riding as a fare-paying passenger crashed. The airplane was owned by Aeroservice, Inc., and piloted by Harold H. Honeywell, an employee of Aeroservice, Inc.

It is apparent from the record that the trial court did not submit to the jury the question of negligence on the part of the defendant Harold H. Honeywell in the actual operation and handling of the plane in the air.

The cause was tried to a jury, resulting in a verdict in favor of the plaintiff and against both defendants, and determining the amount of damages to be awarded to the plaintiff. Judgment was entered on the verdict.

The defendants filed a motion for new trial and motion to have the verdict and judgment entered thereon set aside and to have judgment entered in accordance with the defendants' separate motions for directed verdict one of which was made at the conclusion of the plaintiff's evidence and the other at the conclusion of all of the evidence. The trial court overruled these motions. Defendants appealed.

For convenience we will refer to Winfred Scarborough as plaintiff, to the defendant Aeroservice, Inc., as Aeroservice, and to defendant Harold H. Honeywell as Honeywell or pilot.

The plaintiff's petition, insofar as need be considered here, in substance alleges the accident was proximately caused and brought about through the recklessness and negligence of the defendants Aeroservice and Honeywell in the following particulars to wit: (1) In failing to ascertain the airworthiness or lack of airworthiness of the aircraft; (2) in permitting the aircraft to stand in open weather without sheltering the same and permitting the tail section thereof to become filled with water, thereby creating weight which defendants knew or should have known would cause the airplane to crash; and (3) in failing to inspect the aircraft before flight was attempted.

The answers of the defendant Aeroservice and defendant Honeywell in effect deny generally the allegations of negligence alleged in the plaintiff's petition.

The defendants assign as error: (1) The trial court erred in overruling defendants' separate motions for a directed verdict. (2) The trial court erred in giving instructions Nos. 3, 4, 5, and 6. (3) The trial court erred in refusing to admit exhibits Nos. 26 and 27 into evidence. (4) The trial court erred in admitting all testimony of witness Esmond Avery, president of Aeroservice, relative to his report of the accident made to the Civil Aeronautics Board.

A motion for a directed verdict must for the purpose

of decision thereon be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor, and to have the benefit of every inference that can be reasonably deduced from the facts in evidence. See, Dickman v. Hackney, 149 Neb. 367, 31 N. W. 2d 232; Umberger v. Sankey, 151 Neb. 488, 38 N. W. 2d 21.

The defendants' first assignment of error challenges the sufficiency of the evidence to warrant submission to the jury. This requires an analysis of the evidence, and we set forth that part of the same deemed necessary to determine this assignment of error.

It appears from the record that plaintiff enrolled in a school for airplane mechanics operated by Aeroservice, located at the municipal airport near Omaha. He attended day classes from 7 a. m. to 3 p. m., from January 1949, until the occurrence of the accident on June 23, 1949. Just before 3 p. m., on that date he talked to Mr. Evans, secretary of Aeroservice, about renting an airplane to take a ride after school. It was agreed that he would pay $10 for a 45-minute flight, which he did. Honeywell was chief instructor in the mechanics' school, held a commercial pilot's license, and on occasions flew for Aeroservice. He agreed to fly the plaintiff.

The airplane in question is described as a Fairchild aircraft, model M-62-A-3, a low-winged monoplane, the wing being under the fuselage. This is a two-seated plane with dual controls. There is a canopy cover made of plexiglass which fits over the cockpit in a loose manner. This plane was designed as an army training plane and commonly referred to as a PT-26. After World War II these planes were sold as army surplus for civilian use, and Aeroservice purchased this plane.

Throughout the course of the evidence certain features of this plane are referred to, for instance, grommets. A grommet is described as a little celluloid or

plastic washer which is put on the fabric of the airplane merely as a reinforcement ring. The purpose of the grommets is to let water drain out of the interior of the plane. A bulkhead is an annular reinforcement ring made of plywood three-eighths to one and one-half inches thick which runs around the fuselage shell from the back of the cockpit to the tail and gradually gets smaller, tapering off, to give it the shape. In the part of the plane where the tail-wheel assembly joins the fuselage there is a hole approximately 5 inches in diameter. Inside the fuselage where the tail wheel joins the plane, the tail-wheel assembly is built around this hole to a thickness of approximately three-fourths of an inch. This hole is covered with a heavy duck or light leather boot. Its purpose is to keep the dust out of the actuating hydraulic unit.

The plane had not been moved since June 20, 1949. On June 22, 1949, 24 hours prior to the time of the flight, 1.24 inches of rain fell in one hour between 4 p. m. and 5 p. m. This rain was measured at the municipal airport where the plane was parked in the open, and is shown by the records of the United States Weather Bureau. A weather expert testified that 1.24 inches of rain falling within one hour is more than four times the amount classified as "heavy" rain.

There is a conflict in the testimony as to whether the canopy on this plane was closed or open prior to the time of flight.

The plaintiff testified that after obtaining a pilot to fly the plane they procured parachutes. The oil was checked and the plane filled with gasoline. The plaintiff got into the front seat and the pilot in the rear seat from which seat he operated the plane. They taxied to the proper place to await a clearance signal. The pilot "revved" the engine, tested the two magnetos, got a green light from the tower, and proceeded to take off. The plaintiff watched the instruments and paid no attention to what the pilot was doing because he did

not know anything about flying and had never flown by himself. He remembered that after the take-off the pilot banked the plane to the east to miss the Illinois Central Railroad bridge which crosses the Missouri River. The plane crashed on the Iowa side of the river. The plaintiff remembered nothing after the crash.

Honeywell testified that he was the chief instructor at the aircraft mechanics' school and also held a commercial pilot's license. He had flown a PT-26 on many occasions prior to June 23, 1949, when he flew the plane in which the plaintiff was injured. He testified that when he went out to the plane it was tied down. He untied it and opened the canopy. He made a visual check of the plane. He did not examine the grommets, which are in the belly of the plane and run through the fabric ahead of each bulkhead, to ascertain if there was any water in the tail of the plane, nor did he examine the tail-wheel assembly to see whether or not it was clogged. He further testified that there is no set rule or regulation required by the Civil Aeronautics Administration, hereafter referred to as the C. A. A., to ascertain whether or not there is water in the tail of a plane. Before taking off he made an inspection of the various parts of the plane consisting of the stick, engine, the ailerons, rudder controls, and the trim tabs as far as the control in the cockpit is concerned. He also checked the magnetos. After receiving the green light to take off and the plane had gained altitude of 100 feet or more, he noticed it was not climbing as fast as it should. The climb was unusually slow. The plane was not functioning correctly. When he obtained altitude of 225 feet he observed the tail being heavy, which is caused by excessive weight in the tail. There was no indication of a stall. The plane lost altitude. The tail seemed to be pushed down, and this created more drag. He looked for a place to make a forced landing. Later the plane crashed on the Iowa side of the Missouri

River. He estimated that they were in the air about 3 minutes.

Honeywell further testified that it was not raining on that particular day, but it had rained the night before and there had been intermittent flash rains for two or three days previous to the flight. He did not examine the plane two or three days prior to the flight to ascertain if there was any water in any part of it. Water could possibly drip through the looseness of the canopy into the fuselage of the plane. The only way water could get into the tail of the plane would be if the drain grommets were clogged so the water could not drain out. He explained that a tail-heavy condition can be caused otherwise than by water in the tail. It appears from the evidence that none of the other causes existed in this case.

On April 5, 1949, Honeywell conducted a 100-hour inspection of this plane, required by the C. A. A. He was assisted by four mechanics under his direction. His evidence is to the effect that the grommets were not examined to ascertain whether or not they were plugged, or what their condition was. In a deposition taken previous to trial he testified that this plane remained out in the weather at all times and was not hangared; that the weight in the tail was due to the rain accumulating in the tail; and that it was the only logical source he could think of to cause this condition.

The president of Aeroservice testified that he listed the facts as to how the plane crashed on a form required by the C. A. A., which would show his opinion of the cause of the crash and recommendations to prevent recurrence of such a crash. In this report he gave as his opinion, after summarizing the pertinent parts, that it was his belief that this airplane developed a horizontal stabilizer stall due to excessive weight in the rear end, and that as soon as the water had a chance to surge to the tail end, the stabilizer went out due to this excessive weight. In the report to the Safety Bureau of the Civil

Aeronautics Board where he was asked for suggestions for the prevention of recurrences of this or similar failures, he gave the following answer: "I believe all PT-26 and PT-19s should be inspected before flight when they have been setting out following a heavy rain. Also, drain grommets should be put in the belly of the aircraft in front of every stringer."

He testified on cross-examination that his report was not based on actual knowledge because he was not familiar with the construction of a PT-26. After the accident he looked a PT-26 over and found that they had drain grommets in front of every stringer. In his opinion a fire hose could be put in the interior of the plane, and the water would run back out just as fast as it was put in and would not accumulate in the tail section of the fuselage.

The plaintiff offered certain testimony of this witness given by him in a deposition prior to trial as admissions against interest. This evidence is to the effect that the secretary of Aeroservice had a right to authorize the trip; that a PT-26 is a poor airplane, is marginal and bordering on dangerous; that it is too heavy for the horsepower to make it an airplane with a good margin of safety; and that this plane was not in active use for fare-paying passengers but was in dead storage. He did not remember how much it rained the day before the flight but it rained very hard. He ordered no inspection of the plane to ascertain whether any water got into the fuselage or body of the plane. It appears that this plane was used on occasions preceding this flight.

A witness who was in the Army Air Force during World War II and received his primary training in a PT-19, testified that the PT-19 is very similar to the PT-26, the primary difference being that the PT-19 does not have a canopy cover and the PT-26 does, and also, the PT-26 has a 25 horsepower greater engine than the PT-19. This witness, after explaining the position of the bulkheads, the grommets for drainage in the bottom

of the plane, and the construction of the plane, testified that if water got into the fuselage it would drain to the back or tail part of the plane. If the plane had sat out three days or more, taking into consideration the rain as it appears in this case, he testified he would look into the belly of the plane to see if there was water, or anything loose, or any excessive dirt. He testified that you could kneel down and check the drain grommets. This could not be ascertained by looking at the plane from the outside, nor by sitting in the cockpit and looking around.

A major on active duty with the Strategic Air Command, who qualified as a flight test engineer and commercial pilot during World War II, testified that he ferried PT-26s for the Royal Canadian Air Force as a staff pilot and had approximately 200 hours flight time in this type of plane. After World War II he processed or modified ten such planes for civilian use and personally owned such a plane. He is acquainted with the PT-26 with reference to the tail section of the fuselage which begins behind the cockpit and ends down near the rudder. There is a hole in the tail end of the fuselage area approximately 18 inches long to permit the attachment of the tail-wheel assembly. This hole is covered by sheet metal which forms the contour of the airplane and there is a gap approximately that large in the area of the tail-wheel assembly. Assuming that there was 1.23 inches of rainfall in the 18 hours prior to the accident and that some water got into the tail section of the fuselage, he testified that the water would remain there for a period of one to three hours, and the plane being in an idle position water would be forced to run down the fuselage and out the tail area of the plane. There are no grommets in the belly of the plane, but there are six or eight the length of each spar in the trailing edge of the wing. There are drain holes in the tail section, but he did not believe these were grommets. He further testified that the final obstruction in the tail is only three-fourths of an inch in thickness, and the cut-away sections for the

former strips would allow the water to drain that far any-way. If the plane was properly cared for there would be no occasion for anything there to obstruct it.

An airplane mechanic and shop supervisor for an air-craft company which makes all kinds of repairs on planes, and who had previously been in the employ of Aeroservice, was designated an inspector for the Civil Aeronautics Administration. In this capacity he in-spected planes for airworthiness. He testified that once a year, regardless of the number of hours flown, a cer-tificate is required by the C. A. A. as to the inspection. This is tantamount to relicensing the plane. When PT-26s were sold as army surplus, they were required to be certified by the C. A. A. for airworthiness. He inspected approximately 100 such planes with the purpose of con-verting them to civilian use. He described a PT-26 and identified marks made on an exhibit for demonstration purposes, and mathematically determined the center of gravity of this plane and planes of this type. He then testified that in his opinion 2½ gallons of water could not accumulate in the tail section of a PT-26. Further, as-suming 1.26 inches of rain had fallen between the hours of 4 p. m. and 7 p. m. the day before the accident and there was no rain for 20 hours prior to that time, and the canopy of the plane was open, enough water could not accumulate to disturb the center of gravity beyond toler-ances as prescribed by the C. A. A., or, in other words, that enough water could not accumulate to disturb the flight characteristics of the plane. He further testified that this plane was designed to be hangared outdoors.

A witness who had been an instructor in the Army Air Force and a commercial pilot testified with refer-ence to a PT-19 used for training purposes in the mili-tary service which is similar in construction to a PT-26 and with which he is familiar, and that on the field where he instructed these planes stood out in the weather and were taken in only for 20-hour or 100-hour inspections. In the event anything appeared to be wrong with the

plane mechanics would work on it. The ground crews were charged with seeing that the planes were gassed and oiled; that it was not customary to inspect the interior or tail fuselage for the accumulation of water before flight; and that no instructions were given to cadets to make such inspection nor did the instructor inspect the planes for such purpose.

In this case the defendant Aeroservice is a private carrier, that is, not bound to carry for any reason unless the obligation to do so is voluntarily assumed by virtue of a special contract, and liable for only such loss or injury as results from a failure to exercise ordinary care. See, 9 Am. Jur., Carriers, § 10, p. 435; 6 Am. Jur., Aviation, § 60, p. 36.

This court, in In re Estate of Kinsey, 152 Neb. 95, 40 N. W. 2d 526, had before it negligence involved in the operation of an airplane. We applied the rule: " 'In the absence of statutes covering the operation and management of airplanes at the time and place of an accident, * * * the rules of law applicable to torts—the ordinary rules of negligence and due care—obtain. Thus, the rule of the common law that every person shall use ordinary care not to injure another, that is, such care as the great mass of mankind would use under the same or similar circumstances or such care as the ordinarily prudent person would use under the same or similar circumstances, applies. * * * The care must be commensurate with dangerous consequences to be reasonably apprehended; it may be of a very high degree under some circumstances and of a slight degree under others.' " See, also, 6 Am. Jur., Aviation, § 60, p. 36; 2 C. J. S., Aerial Navigation, § 19, p. 907; Greunke v. North American Airways Co., 201 Wis. 565, 230 N. W. 618, 69 A. L. R. 295; Kasanof v. Embry-Riddle Co., 157 Fla. 677, 26 S. 2d 889.

The rules of law above announced would be no different in the instant case where negligence is involved in the maintenance and inspection of an airplane before

flight carrying a fare-paying passenger. The defendants were under no duty to use the highest degree of care, but to use that degree of care that men of reasonable diligence and foresight would ordinarily exercise. This case was tried in accordance with the foregoing rules of law.

The defendants argue that the plaintiff must prove by a preponderance of the evidence that water got into the tail or fuselage of this airplane causing excessive weight in that part of the plane which constituted the proximate cause of the accident. In this connection, a PT-26 was designed to be left out in the open in any type of weather, was so constructed that water would drain out of the tail and the fuselage, and a sufficient quantity of water would not accumulate so as to disturb the flight characteristics of the plane. Defendants further argue that there is no C. A. A. regulation requiring such inspection, therefore, as a matter of law, there was no duty on the part of the defendants under the facts in this case to inspect the plane to ascertain whether or not there was water in the tail or fuselage; and that this is made clear by the testimony of defendants' experts, Major Miller, Mr. Miller, and Mr. Stuenkel.

The evidence discloses that this plane was in the open with the canopy possibly open; and that there was a downpour of rain approximately 19 hours before time of flight equal in intensity to four times "heavy" rain. This investigation for the accumulation of water in the tail or fuselage would be a simple matter. It could be accomplished by kneeling down to insert a pointed object through the drain holes to ascertain if they were clogged or free from obstructions, and examining the fabric around the lower portion of the fuselage and the tail of the plane. The dangerous consequences to be reasonably apprehended would be initially the accumulation of water in the plane which would affect the weight and balance of the plane, which is an important matter to be considered before any flight. The

evidence disclosed a tail-heavy condition in this plane which could and did result in a serious accident. This type of inspection is just as important as ascertaining the sufficiency of the fuel and oil, and the operation of the engine.

We believe the following language in 38 Am. Jur., Negligence, § 24, p. 668, is applicable: "Liability for negligence may be predicated upon the lack of foresight or of forethought which is exhibited where one remains in voluntary ignorance of facts respecting the danger inherent in the particular act or instrumentality involved, concerning which a reasonably prudent person would become advised, on the theory that such ignorance is the equivalent of negligence. Inattention to the duty to exercise care in a situation which reasonably may be regarded as hazardous is negligence, notwithstanding the act or omission involved would not in all cases, or even ordinarily, be productive of injurious consequences."

In 38 Am. Jur., Negligence, § 24, p. 670, it is said: "The risk reasonably to be perceived defines the duty to be obeyed; it is the risk reasonably within the range of apprehension, of injury to another person, that is taken into account in determining the existence of the duty to exercise care."

The rules of law relating to the operation of aircraft, in the absence of statute, in general are rules relating to negligence and nuisance, and are not distinguishable from those which relate to the operation of vehicles, perhaps, more closely to motor vehicles on land. It is assumed that the pilot of an airplane, like the driver of an automobile, is charged with a duty toward a passenger for hire in such plane commensurate with the nature of the instrument employed and with the duty imposed on him by law. See, Wilson v. Colonial Air Transport, Inc., 278 Mass. 420, 180 N. E. 212, 83 A. L. R. 329; Greunke v. North American Airways Co., *supra;* Read v. New York City Airport, Inc., 145 Misc. 294, 259 N. Y. S.

245; Annotation, 12 A. L. R. 2d 677-679.

In applying the rules of negligence governing in tort cases to land-operated vehicles which fall under the same rules of negligence, the owner or driver of a motor vehicle must exercise reasonable care, in the inspection of his machine, to discover any defects that may prevent its proper operation, and is chargeable with knowledge of any defects which such inspection would disclose. See 2 Blashfield, Cyclopedia of Automobile Law and Practice, § 821, p. 1.

In Boele v. Colonial Western Airways, Inc., 110 N. J. L. 76, 164 A. 436, a case wherein an airplane accident occurred because of defective parts of an engine and at least two passengers were killed, the trial court instructed the jury to the effect that the defendant was required to make a proper inspection of the plane before flight, which is in effect the same as the rule above stated with reference to the inspection of an automobile.

The defendants assert that negligence is never presumed and not to be inferred from the mere fact that an accident happened. If the cause of the accident is not ascertained except as a matter of guess, conjecture, or surmise, the defendant would then be entitled to prevail. An abundance of authorities support the above proposition.

In addition to direct evidence, or in the absence of the same, circumstantial evidence can be sufficient to sustain a verdict depending solely thereon for support if the circumstances proved by the evidence are of such a nature and so related to each other that the conclusion reached is the only one that can fairly and reasonably be drawn therefrom. See, Halliday v. Raymond, 147 Neb. 179, 22 N. W. 2d 614; Bixby v. Ayers, 139 Neb. 652, 298 N. W. 533; Anderson v. Interstate Transit Lines, 129 Neb. 612, 262 N. W. 445; Zimmer v. Brandon, 134 Neb. 311, 278 N. W. 502.

A plaintiff is not bound to exclude the possibility that

the accident might have happened in some other way, but is only required to satisfy the jury, by a fair preponderance of the evidence, that the injury occurred in the manner claimed. See, Fonda v. Northwestern Public Service Co., 138 Neb. 262, 292 N. W. 712; Pahl v. Sprague, 152 Neb. 681, 42 N. W. 2d 367; English v. Miller (Tex. Civ. App.), 43 S. W. 2d 642. See, also, Boele v. Colonial Airways, *supra.*

We conclude, in the light of the authorities cited and from an analysis of the evidence, that the evidence was sufficient to warrant submission to the jury of the question of negligence on the part of the defendants. The defendants' assignment of error cannot be sustained.

The defendants contend the trial court erred in admitting all of the testimony of the witness Esmond Avery, president of Aeroservice, relative to his report of the accident made to the C. A. A.

In the instant case the witnesses Avery, president of Aeroservice, and Honeywell in depositions qualified as experts in their field. Avery also made a report to the C. A. A. We deem it unnecessary to repeat this evidence. The admissions of these witnesses related to a material issue—the theory as to how the accident happened—and were clearly admissible when it appears from the evidence that these witnesses subsequently, at the trial, changed their positions wherein it was urged the crash was caused by forces other than the rain and water accumulation.

The declarations and admissions of a party to an action, against his own interest, upon a material matter, are admissible against him as original evidence. See, Havlik v. Anderson, 130 Neb. 94, 264 N. W. 146; McDaniel v. Farlow, 132 Neb. 273, 271 N. W. 905; Brown v. Hyslop, 153 Neb. 669, 45 N. W. 2d 743; O'Hare v. Peterson, 150 Neb. 151, 33 N. W. 2d 566.

We conclude the defendants' assignment of error cannot be sustained.

The defendants predicate error on the refusal by the

trial court to receive exhibits Nos. 26 and 27 in evidence. Exhibit No. 26 was identified as the airworthiness certificate issued by the C. A. A. on April 5, 1949, belonging to the plane involved herein. Exhibit No. 27 was a periodic aircraft inspection report on the plane involved, signed by Honeywell as mechanic. This was an inspection required by the C. A. A. to be done every 100 hours of flight, or once a year regardless of the hours flown, for a relicensing of the plane by the C. A. A. The purpose for which these exhibits were offered was to show the airworthiness of the PT-26 involved in the accident and that the regulations in regard to maintenance and safety with respect thereto had been complied with.

It appears from the record that all facts relating to the exhibits were testified to in detail by various witnesses at the trial. The trial court has a wide discretion in determining the relevancy and materiality of exhibits such as these, and in determining whether or not they are so remote in time as to have any bearing upon the issues. In any event, the failure to admit these exhibits does not constitute reversible error, and the defendants were not prejudiced thereby.

The defendants predicate error on the giving by the trial court of instructions Nos. 3, 4, 5, and 6.

Instruction No. 3, insofar as necessary to consider, is in substance as follows: (1) It places the burden of proof on the plaintiff to establish by a preponderance of the evidence that the defendants were negligent in failing to adequately inspect the airplane before flight was attempted; and (2) that such negligence was the proximate cause of the injury and damages sustained by the plaintiff.

The contention is that this instruction indicates that the plaintiff is not obligated to carry the burden of proof which he must do to prove that water got into the plane, stayed there, and caused the tail-heavy condition which resulted in the crash; and that the jury is not entitled

to speculate or surmise as to other reasons.

In instruction No. 1 given by the trial court, the jury was advised of specific negligence claimed by the plaintiff in the following language: "* * * negligence on the part of the defendants in failing adequately to inspect the aircraft before flight, and * * * that the aircraft was permitted to stand in the open weather without shelter, and that the tail section thereof became filled with water and created a weight which such inspection would have disclosed and which weight made the airplane unmanageable; * * *." In addition, in instruction No. 5, the jury was instructed: "If whatever caused the plane to have a tail-low position or tail-heavy position, the burden of which is upon the plaintiff to establish by a preponderance of the evidence, could, in the exercise of ordinary care, have been discovered by reasonable inspection of the plane before use, the defendants would be negligent in failing to make such inspection."

When instruction No. 3 is considered in connection with instructions Nos. 1 and 5, it is obvious that the court adequately instructed on the burden of proof required of the plaintiff.

We have examined the other instructions complained of by the defendants and find no prejudicial error therein. The following authorities are applicable.

In Brown v. Hyslop, *supra*, the court said: "The meaning of an instruction, not the phraseology, is the important consideration, and a claim of prejudice will not be sustained when the meaning of an instruction is reasonably clear. If different instructions are given on the same subject they should be considered together, and if they fairly submit the case, it will not be reversed for indefiniteness or ambiguity in one of the instructions." See, also, In re Estate of Kinsey, *supra*.

For the reasons given herein, the judgment entered on the verdict by the trial court should be, and the same is hereby, affirmed.

AFFIRMED.