KEYSTONE BUS LINES, INC., A NEBRASKA CORPORATION, APPELLANT, v. ARA SERVICES, INC., DOING BUSINESS AS EDUCATIONAL & RECREATIONAL SERVICES, A CALIFORNIA CORPORATION, APPELLEE.

336 N.W.2d 555

Filed July 15, 1983. No. 82-352.

Harris, Feldman, Stumpf & Pavel, for appellant.

Norman Denenberg, for appellee.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, WHITE, HASTINGS, CAPORALE, and SHANAHAN, JJ.

SHANAHAN, J.

Plaintiff, Keystone Bus Lines, Inc. (Keystone), appeals dismissal of its action against defendant, ARA Services, Inc. (ARA), to enforce a provision contained in a contract for purchase of certain assets of

Keystone. The provision required ARA to pay Keystone $100,000 if ARA obtained specified revenues from busing operations. Keystone alleged that ARA intentionally prevented occurrence of a condition precedent, i.e., attainment of the prescribed revenues, so the court should disregard the condition and order ARA to pay $100,000. The trial court directed a verdict for ARA, finding no evidence that ARA intentionally prevented revenues from reaching the specified levels of sales. Keystone assigns as error the directed verdict and dismissal of Keystone's petition. We affirm.

In March 1976 the Omaha Public Schools (OPS) awarded a busing contract to ARA. This contract, a result of court-ordered busing and integration, involved OPS' busing second, third, and ninth graders.

After obtaining the OPS contract, ARA began searching for bus facilities and in the spring discussed with Keystone possible purchase of its Omaha bus facilities. On July 30, 1976, Keystone signed a contract to sell certain assets to ARA, including its buses and busing contracts. The contract stated that, in addition to the $555,000 purchase price, ARA would pay $50,000 if sales for 1976-77 reached $1 million, and $50,000 if sales for 1977-78 reached $1.2 million. *Sales*, as defined in the agreement, was gross income from bus service conducted by ARA in Omaha, including charter service for school districts other than OPS and "parent-pay" routes where parents paid for busing their children to school. Specifically excluded from *sales* was revenue derived from bus service for OPS.

After signing its contract with Keystone, ARA sought drivers for the routes previously served by Keystone and utilized television, newspaper ads, flyers, and the Nebraska Job Service in the search. Outside factors thwarted the recruiting efforts by ARA. Women, fearing violence in the integrated school system, were reluctant to apply as drivers, and many of the drivers recruited by ARA failed the

Department of Motor Vehicles' licensing test. Also, ARA faced the problem that recruiting too early could result in losing the drivers before the school year started.

When school began in 1976, ARA was responsible for transportation of OPS pupils and Keystone's obligations, including a Millard school contract and parent-pay routes. ARA did not have enough drivers for all bus routes and made a business decision to allocate its drivers to the OPS and Millard routes. There was some decline in the parent-pay routes, because busing necessitated in the integrated school system supplied free transportation for pupils. Due to the driver shortage ARA was not able to provide full service for the parent-pay routes until the end of October.

For the year 1976-77, revenues from the operations acquired by ARA from Keystone were $760,902, and in the year 1977-78 the revenues were $373,310. According to the levels of revenue specified in the agreement, sales did not obligate ARA to pay an additional $50,000 in either of those years.

Keystone contends that ARA demonstrated bad faith by initially neglecting the parent-pay routes, which resulted in a permanent loss of revenue and prevented ARA's attaining the specified levels of revenue.

Robert Wakin, president of Keystone who had negotiated the sales contract, testified that sales in 1975-76, i.e., the year before the sale to ARA, exceeded $1 million and that he had conservatively projected that sales in 1976-77 would be in excess of $1.1 million. Wakin stated that ARA should have recruited drivers earlier than August and that the initial absence of service on parent-pay routes caused parents to stop using services of ARA. Wakin also testified that beginning in August 1976 ARA made a good faith effort to acquire drivers. On account of ARA's initial erratic service, both Ralston High School and Marian High School transferred trans-

portation to another bus company. ARA presented evidence that it made efforts to acquire sufficient drivers for the parent-pay routes before school began in 1976.

In considering a directed verdict the Supreme Court must assume the truth of the material and relevant evidence Keystone presents, find every controverted fact in its favor, and give it the benefit of every reasonable inference deducible from the evidence. *Syas v. Nebraska Methodist Hospital Foundation*, 209 Neb. 201, 307 N.W.2d 112 (1981).

If the promisor prevents or hinders the occurrence of a condition precedent and if the condition would have occurred except for such prevention or hindrance, the condition is excused. *Schinstock v. Butterfield*, 141 Neb. 877, 5 N.W.2d 86 (1942); *Householder v. Nispel*, 111 Neb. 156, 195 N.W. 932 (1923); *Omaha Public Power Dist. v. Employers' Fire Insurance Co.*, 327 F.2d 912 (8th Cir. 1964); Restatement (Second) of Contracts § 295 (1981). This rule is based on the maxim one cannot profit from or escape liability for his own wrongdoing, but application of such maxim requires demonstration that the promisor took deliberate steps to impede occurrence of the condition precedent. *Omaha Public Power Dist. v. Employers' Fire Insurance Co., supra.*

In viewing the evidence in the light most favorable to Keystone, we find no evidence that ARA in bad faith caused the revenues to fall below the specified levels. Even if ARA's initial, erratic service regarding the parent-pay routes did cause a decline in revenues, Keystone failed to show that ARA deliberately discouraged or impeded use of the parent-pay routes. To the contrary, the undisputed evidence shows that ARA made good faith efforts to obtain sufficient drivers to staff the parent-pay routes before school commenced in 1976. When to recruit drivers and where to allocate drivers were business decisions left to the discretion and judgment of ARA. In selling the bus business to ARA, Keystone relin-

quished control over such business decisions and accepted the risk that good faith decisions and business judgments by ARA could cause revenues to fall below the specified levels which obligated ARA to pay the additional amounts to Keystone. Good faith governed the business decisions which ARA made after the parties entered into their agreement.

AFFIRMED.