MARK GREENING, BY DOUGLAS J. GREENING AND SANDRA K. GREENING, PARENTS AND NEXT FRIENDS, AND THE UNITED STATES OF AMERICA, APPELLANTS, V. THE SCHOOL DISTRICT OF MILLARD, ALSO KNOWN AS MILLARD PUBLIC SCHOOLS, DISTRICT NO. 17, APPELLEE.

393 N.W.2d 51

Filed September 5, 1986.    No. 85-467.

Frederick S. Cassman of Abrahams, Kaslow & Cassman, for appellants.

Charles F. Gotch of Cassem, Tierney, Adams, Gotch & Douglas, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

On May 20, 1982, Mark Greening, age 11, suffered a fracture to his right upper femur while participating in a physical therapy program administered at an elementary school in the Millard school district. Mark, by his parents, Douglas J. and

Sandra K. as next friends, filed an action for negligence, naming the school district and Kari T. Miller as defendants. The case was tried without a jury in accordance with Neb. Rev. Stat. § 23-2406 (Reissue 1983) (suits against political subdivisions "shall be heard and determined by the appropriate court without a jury"). At the conclusion of Mark's case in chief, the district court for Douglas County granted the school district's motion for a directed verdict and dismissed the petition. Kari Miller is no longer involved in the proceedings. We affirm.

The district court determined, as a matter of law, that evidence was insufficient to sustain a judgment in favor of Mark. In reviewing a directed verdict the Supreme Court assumes the truth of material and relevant evidence presented by the nonmoving party. See *Keystone Bus Lines v. ARA Services*, 214 Neb. 813, 336 N.W.2d 555 (1983). Regarding a directed verdict, the nonmoving party is entitled to have every controverted fact resolved favorably to the nonmoving party and to receive the benefit of every inference reasonably deducible from the evidence. See *Rose v. United States Nat. Bank*, 218 Neb. 97, 352 N.W.2d 594 (1984). Only where reasonable minds can draw but one conclusion from the evidence presented is a directed verdict an appropriate method of terminating litigation. See *Tank v. Peterson*, 219 Neb. 438, 363 N.W.2d 530 (1985). Applying the preceding principles pertaining to a directed verdict, we consider the evidence adduced in the present case.

Mark was born in 1970 with a congenital deformity of the spinal column, known as myelodysplasia, a condition which, for Mark, resulted in some elements of paralysis of his legs. A common effect of myelodysplasia is osteoporosis, described, generally, as loss or diminishment of mineral in the bone. As a result of osteoporosis, bone tends to become less strong and less able to sustain the normal stress of day-to-day activity. Because inactivity results in more osteoporosis, one treating osteoporosis must walk "a fine line of providing enough activity to allow the bone to build up but not so much activity as to provide at that point in time extra stress upon the bone."

When paralysis associated with myelodysplasia left Mark unable to ambulate, he eventually suffered osteoporosis,

weakening the bones in his legs. Although provided with leg braces and special crutches by an orthopedic surgeon, Mark, as of 1982, was unable to move on his feet without assistance from others and has spent considerable time confined to a wheelchair.

Mark entered the Millard public school system in the late 1970s and, eventually, came under the care of two therapists associated with the school district, Lynda Shoemaker, a physical therapist, and Kari Miller, an occupational therapist. During the 1980-81 school year, the school district paid Shoemaker and Miller and directly supervised their activities as therapists. In June 1981, however, that arrangement changed. Although Shoemaker and Miller continued to work exclusively with students of the school district, the therapists became employees of the State of Nebraska, paid by the state and employed under the direction of the state Services for Crippled Children, which had the responsibility of providing therapy programs for physically disabled children. After June 1981 neither Shoemaker nor Miller regularly attended staff meetings held in the school district, and both scheduled therapy sessions independent from the school district's supervision.

During the 1981-82 school year, Shoemaker developed an exercise program designed to enable Mark to eventually "move out of his wheelchair" and ambulate "with the help of either a walker or special type of crutches." Specifically, the Shoemaker program required Mark to perform four different exercises, including numerous situps and pushups. Shoemaker, a professional physical therapist licensed by the state, see Neb. Rev. Stat. § 71-102 (Reissue 1981), did not submit her program to any physician. Shoemaker did consult with Mark's orthopedist regarding general goals to be achieved by Mark through physical therapy and was aware of Mark's medical condition. Miller also developed an exercise program designed to develop strength in Mark's arms and thereby increase his independence to engage in "activities of daily living." Both programs of therapy were developed without consultation with or directive contribution from the school district's supervisory personnel.

Initially, Shoemaker and Miller administered and supervised

their therapy programs prescribed for Mark. By the spring of 1982 an increasing workload for the therapists made it difficult to personally supervise all students assigned for therapy. In early May 1982 Sherrie Elliott, the school district's coordinator of special education, contacted Shoemaker and suggested that she use Rendell Paden, a school district employee, as an "aide" to "work with Mark." Paden, Elliott's brother, was not a qualified therapist and had no experience in dealing with individuals suffering from Mark's particular condition. Part of Paden's duties as a school district employee, however, included working with children in special education programs. In fact, it was the school district's practice to provide a professional therapist with aides who would "monitor" the program developed by therapists. Sometime in May, Shoemaker and Miller met with Paden to describe and demonstrate their respective exercise programs. According to the therapists' directions to Paden, Mark's exercises were to be performed with Mark's leg braces in place. Paden thereafter assumed the task of overseeing Mark's performance of the exercises ordered by the therapists.

By May 1982 Mark was quite familiar with the exercises to be performed under the therapists' programs. It was Paden's function, as an aide for the therapists, to remove Mark from his classroom, take him to the school gym, and assist him from the wheelchair onto a mat, where Mark performed the exercises contained in the regimen devised by the therapists. For approximately a week Paden supervised the exercise programs without incident. On May 20 Paden took Mark to the gym and assisted him to the mat, where Mark began to perform the exercises developed by Shoemaker. During that exercise session, Mark complained about a popping sensation in his right leg, and pain. Paden, who was unfamiliar with Mark's medical condition, did not react to Mark's complaint and did not instruct the boy to discontinue the exercises. Eventually, Miller appeared on the scene to conduct the exercise program she had designed. After Mark again complained about pain in his leg, Miller "palpated" the leg but failed to detect an injury and proceeded to put Mark through the exercise program.

At home that evening, Mark told his mother about the pain

in his right leg. Mrs. Greening noticed that Mark's leg was positioned strangely and drove Mark to the hospital. X rays disclosed that Mark's right upper femur was fractured, and surgery was eventually performed to correct such condition.

On May 10, 1983, Mark filed his lawsuit, naming the school district and Miller as defendants. Paragraph 5 of Mark's petition alleges:

5. That the plaintiff's injuries were the direct and proximate result of the negligence of the defendants and of their agents and employees, in the following particulars:

(a) In permitting and allowing physical therapy exercises to be administered to the plaintiff by Rendell K. Paden, who was not qualified either as a physical or occupational therapist.

(b) In permitting and allowing such exercises to be administered to the plaintiff which due to his disabilities the defendants knew or should have known were like[ly] to cause injury to the plaintiff.

(c) In failing to make any investigation of his injuries at the time of plaintiff's initial complaint or to obtain medical assistance on behalf of the plaintiff.

(d) In directing the plaintiff to continue to perform physical exercises notwithstanding plaintiff's protest of pain and discomfort in his right leg area.

During trial, Mark settled his claim against Miller. At trial Mark called, among other witnesses, two physicians—one an orthopedist, the other a specialist treating physical disabilities. The orthopedist testified that Mark's fracture occurred as the result of the "physical activity" involved in the therapy program. Specifically, the orthopedist testified that Mark's leg brace acted as a focal point, which, as a result of the exercise, placed stress on the weakened bone, thus causing the fracture of Mark's right upper femur. The specialist testified that the exercises in Shoemaker's program "were not proper" because such exercises produced stress as the result of "the contracture at the hip and the descent and ascent of the gluteal mass." The specialist concluded that, as a result of the injury, Mark's physical and mental condition had significantly deteriorated.

Neither physician expressed an opinion that Mark's injury was in any way related to Paden's supervision of the exercise program. Mark also called Shoemaker, who conceded that she made no evaluation whether Mark's leg braces would, during the exercises, place "pressure against his thighbones."

At the close of Mark's evidence, the school district moved for a directed verdict. The court granted that motion and dismissed Mark's petition. Mark's sole contention is sufficiency of evidence, making the directed verdict and dismissal incorrect. Our inquiry and review is to determine whether there is sufficient evidence to sustain any reasonable basis, as alleged in Mark's petition, to impose liability on the school district.

> There are three basic requirements in establishing proximate cause. The first requirement is that the negligence be such that "without which the injury would not have occurred," commonly known as the "but for" rule. . . .
>
> The second requirement is that the injury be the natural and probable result of the negligence. . . .
>
> . . . .
>
> The third requirement is that there be no efficient intervening cause.

*Daniels v. Andersen,* 195 Neb. 95, 101-02, 237 N.W.2d 397, 402 (1975). See, also, *Saporta v. State,* 220 Neb. 142, 368 N.W.2d 783 (1985).

" 'The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it.' " *Saporta v. State, supra* at 149, 378 N.W.2d at 787, quoting from Prosser and Keeton on the Law of Torts, *Proximate Cause* § 41 at 266 (5th ed. 1984).

As general background, there is ample evidence to support a finding that Shoemaker's exercise program was negligently formulated or designed and that such negligence caused the fracture of Mark's leg. Numerous courts, considering the legal responsibility of school districts, have held that districts and their supervisory personnel have a general duty to protect and properly supervise students entrusted to their care and custody. See, *Benton v. School Bd. of Broward Cty.,* 386 So. 2d 831 (Fla.

App. 1980); *Sewar v. Gagliardi Bros.*, 69 A.D.2d 281, 418 N.Y.S.2d 704 (1979); *Stanley v. Board of Education*, 9 Ill. App. 3d 963, 293 N.E.2d 417 (1973); *Caltavuturo v. Passaic*, 124 N.J. Super. 361, 307 A.2d 114 (1973); *Albers v. Independent Sch. Dist. No. 302 of Lewis Co.*, 94 Idaho 342, 487 P.2d 936 (1971); *Carabba v. Anacortes Sch. Dist.*, 72 Wash. 2d 939, 435 P.2d 936 (1967). At least one court has recognized a school district's duty to provide nonnegligent supervision of its students as a nondelegable duty. See *Carabba v. Anacortes Sch. Dist., supra*, where a school district may be vicariously liable for negligent acts of its employees or agents, irrespective of a negligent employee's character as a servant or independent contractor. See, Restatement (Second) of Agency § 214 (1958); Restatement (Second) of Torts §§ 416-429 (1965). In the present case, however, we need not reach the question whether the school district had a nondelegable duty. As characterized in *Foltz v. Northwestern Bell Tel. Co.*, 221 Neb. 201, 213, 376 N.W.2d 301, 309 (1985): "A nondelegable duty means that an employer of an independent contractor . . . by assigning work consequent to a duty, is not relieved from liability arising from the delegated duties negligently performed." During the 1981-82 school year, when the exercise program was developed, no agency or employment relationship existed between Shoemaker and the school district. As an employee of the state, operating under direction of a state agency, Shoemaker was an agent or employee of the state, not the school district. The absence of any agency or employee relationship between Shoemaker and the school district would have defeated any attempt to impose vicarious liability on the school district for Shoemaker's negligence.

We now turn to the allegations of negligence contained in paragraph 5 of Mark's petition. Allegation 5(a) seeks to impose liability on the school district for negligence in allowing Paden to "administer" Shoemaker's physical therapy program. Mark contends that Sherrie Elliott, coordinator of special education for the school district, permitted Paden to perform physical therapy on Mark, knowing that Paden was not a qualified physical therapist.

The theory asserted in Mark's allegation 5(a) is sound.

According to the Restatement (Second) of Agency § 213 at 458: "A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless: . . . (b) in the employment of improper persons or instrumentalities in work involving risk of harm to others." Similarly, the Restatement (Second) of Torts § 411 at 376 provides that an employer "is subject to liability for physical harm to third persons caused by his failure to exercise reasonable care" in selecting the employee, even if such employee is an independent contractor. Consequently, in the case before us, the parties focus much of their attention on the extent of Elliott's knowledge regarding tasks to be performed by Paden during the exercise program during which Mark was injured. The school district contends Elliott knew only that Paden would assist Shoemaker in conducting the therapy program and neither directed nor allowed Shoemaker to delegate complete supervision of the exercises to Paden. Mark counters that Elliott did know the extent of Paden's authorized participation in the therapy program and that the school district should be held liable for the foreseeable consequences of Paden's incompetence. Both arguments, however, overlook the fundamental issue raised by allegation 5(a).

To impose liability on an employer for negligently entrusting work to an employee incompetent to perform such work, a plaintiff must not only show that the employer negligently selected a person incapable of performing the work but also show that the conduct of the incompetent employee was a proximate cause of injury to another. The employee's characteristic, quality, or deficiency must proximately cause the harm producing injury to another. See Restatement (Second) of Torts § 411, comment *b*. As stated in comment *d*. to Restatement (Second) of Agency § 213:

> Liability results under the rule stated in this Section . . . because the employer antecedently had reason to believe that an undue risk of harm would exist because of the employment. The employer is subject to liability only for such harm as is within the risk. If, therefore, the risk exists because of the quality of the employee, there is liability only to the extent that the harm is caused by the quality of

the employee which the employer had reason to suppose would be likely to cause harm.

Although the evidence is sufficient to support a finding that Shoemaker's exercise program was negligently formulated or designed, there is no evidence showing that Mark's injury resulted from the *manner* in which the defective program was administered or supervised by Paden. The physicians testifying for Mark linked the injury to pressure placed on the bone on account of the nature of the exercise. Neither physician even suggested that Paden incorrectly or incompetently supervised or conducted the exercise regimen, and neither physician testified that Paden's action or inaction caused Mark's injury. Admittedly, Paden was not qualified to conduct physical therapy, which is defined in Neb. Rev. Stat. § 71-2801 (Reissue 1981) as "the treatment of any bodily condition of any person by the use of the physical, chemical, and other properties of heat, light, water, electricity, massage, and active or passive exercise." Whatever may have been Paden's deficiency as a physical therapist, there is no evidence to support a finding that any deficiency on Paden's part in the exercise regimen caused a recognized risk of harm to anyone in Mark's condition and was, therefore, a cause of Mark's injury.

To sustain a cause of action based on allegation 5(a) of his petition, Mark was required to show more than the fact that Paden was not qualified to perform the tasks assigned by Shoemaker. Because Paden's deficiency as a physical therapist, even incompetence, was not a proximate cause of Mark's injury, the school district cannot be held liable for permitting or directing Paden to assist, supervise, or observe the exercise program administered to Mark.

In subsection (b) of paragraph 5 in his petition, Mark alleges the school district was negligent in allowing and permitting the exercises to be administered. Again, the theory underlying such allegation is grounded on a legally cognizable principle, namely, a school district may be liable in permitting negligent conduct to occur on its premises when the school district knew, or reasonably should have known, that the negligent conduct on its premises presented an unreasonable risk of harm to those entrusted to the school. See Restatement (Second) of Agency

§ 213(d) (a person conducting activity through servants or other agents is subject to liability for "permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control"). Here, no evidence indicates that the school district's supervisory personnel were aware of either the specific exercise program being administered to Mark or the potential dangers inherent in such program as far as Mark was concerned. The only basis for imposition of liability, therefore, would be a duty that the school district must learn about dangers of the exercise regimen and take steps to prevent such dangerous activity on its premises. Although there may be a situation where a school district's supervisor has a duty to take affirmative steps to assure safe conduct of an otherwise potentially dangerous activity on school premises, see *Vargo v Svitchan*, 100 Mich. App. 809, 301 N.W.2d 1 (1980) (school athletic director required to promulgate reasonable safety precautions to minimize injury to students participating in weight training program), such duty did not exist in the present case. Shoemaker was a licensed professional, paid by the state to administer physical therapy to students in public school systems. The district was entitled to rely upon the competence of a professional therapist, licensed, paid, and supplied by the state. To hold otherwise would require a school district to independently verify the safety of a program developed by a professional who is entrusted by the state with the responsibility of carrying out such program. Under the facts of this case, we decline to impose such duty on the school district.

Liberally construed, allegation 5(b) may also be read to apply to Paden, who was actually aware of the exercises being performed. Assuming, but not deciding, that Paden was an agent of the school district and that his negligence would be imputed to the school district, Paden's conduct concerning the exercises to be performed might provide a basis for imposing liability on the district. However, there is no evidence that Paden knew the potential medical danger associated with the exercises. This is not to say that an individual, conscious of such individual's own ignorance and the possible danger consequent

to such lack of knowledge, may always justifiably proceed in the face of that known ignorance. As expressed in Prosser and Keeton on the Law of Torts, *Negligence: Standard of Conduct* § 32 at 185 (5th ed. 1984):

[A person may] be engaged in an activity, or stand in a relation to others, which imposes upon him an obligation to investigate and find out, so that the person becomes liable not so much for being ignorant as for remaining ignorant; and this obligation may require a person to know at least enough to conduct an intelligent inquiry as to what he does not know.

There may be situations where an uninformed individual is negligent in failing to remove that individual's ignorance which causes injury to another. See *Scarborough v. Aeroservice, Inc.*, 155 Neb. 749, 761, 53 N.W.2d 902, 909 (1952) (" 'Liability for negligence may be predicated upon the lack of foresight or of forethought which is exhibited where one remains in voluntary ignorance of facts respecting the danger inherent in the particular act or instrumentality involved . . . .' "). As a general rule, however, a nonprofessional, competently executing an order from a professional, may be held liable for the damage resulting from execution of such order if the order given was so obviously improper that an ordinarily prudent person, under the circumstances, would have refrained from carrying out the professional's order or direction. See *City of Somerset v. Hart*, 549 S.W.2d 814 (Ky. 1977). In the present case we cannot conclude that the orders or directions given by any therapist to Paden were so obviously improper, thereby requiring Paden to disregard and refuse to carry out those directions, or, at least, make further inquiry regarding correctness of any order or direction given.

The remaining allegations in paragraph 5 are without merit. Allegation 5(c) refers to Paden's failure to respond to Mark's complaints. While the record reflects Paden's failure to respond to Mark's complaints about his pain experienced in his leg, there is no evidence, such as a physician's testimony, that Paden's failure to respond increased or aggravated the fracture already produced by the exercise program. Paden's failure to act upon Mark's complaints, even if negligence, was not a proximate

cause of the particular injury alleged in Mark's petition and established at trial. Allegation 5(d) alleges continuation of the exercises in the face of Mark's complaint of pain in his leg. What we have said in disposing of allegation 5(c) applies equally to disposition of the allegations found in 5(d), namely, the evidence does not establish that conduct in continuing the exercises was a proximate cause of Mark's bodily injury alleged and established by evidence at trial.

We do not question the gravity of Mark's injuries and the obviously serious consequences of those injuries. The fundamental question asked is: What is the legal basis for imposing liability on the school district of Millard? On the basis of the record presented for review, we are compelled to answer that there is no legal basis for imposing liability on the school district, and, therefore, we affirm the judgment of the district court.

AFFIRMED.