AMELIA M. JOHNSON OBAN, APPELLANT, V. KEITH E.
BOSSARD, APPELLEE.

267 N. W. 2d 507

Filed June 28, 1978. No. 41418.

Patrick L. Cooney of McCormack, Cooney & Mooney, and Robert I. Eberly, for appellant.

Kirk S. Blecha of Baird, Holm, McEachen, Pedersen, Hamann & Haggart, for appellee.

Heard before WHITE, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ., and HASTINGS, District Judge.

PER CURIAM.

This case involves an action for personal injuries sustained in the crash of a private plane on August 30, 1972. Plaintiff Oban was a passenger in the four passenger Cessna 182 aircraft owned and piloted by the defendant Bossard. The flight originated in Neligh, Nebraska, with the ultimate destination Las Vegas, Nevada. The crash occurred in the Rocky Mountains near Eldora, Colorado. At the close of all the evidence, plaintiff moved for a directed verdict of liability, which motion was denied. The jury was instructed and, after deliberating, returned a verdict for the defendant. After plaintiff's motion for new trial was denied, this appeal followed. There are two assignments of error which have been properly raised, preserved and argued in this appeal: (1) Whether the trial court erred in denying the motion for a directed verdict; and (2) whether the trial court erred in instructing the jury on the doctrine of sudden emergency. Of course included within the latter is whether such error, if existing, was prejudicial or harmless.

The defendant Bossard was a licensed private and commercial pilot. He obtained his private license in about 1967 and his commercial license in 1970. A minimum of 40 hours flight-time is required before an individual may be tested for a private license, and defendant indicated he had about 160 hours of flight-time when he obtained his commercial license. Some instrument flying is required before a com-

mercial license is issued, and such a license authorizes a pilot to carry passengers for hire.

Defendant had prepared flight plans for three different routes. On the morning of August 30, 1972, defendant checked with the Grand Island flight service about weather conditions, selected this particular route, and activated his flight plan around 6 a.m. The plan called for a refueling stop in Grand Junction, Colorado, but this was changed en route to Kremmling, Colorado, some 90 miles east, because the defendant felt his fuel supply might be marginal if extended to Grand Junction. Defendant had flown over mountains on four or five previous occasions, but never this particular route. The route had been selected by the defendant because of favorable weather conditions, but it was described by plaintiff's experts as the most difficult and dangerous of the routes available. Defendant was flying a VFR (visual flight rules) flight plan as opposed to an IFR (instrument flight rules) flight plan.

Defendant testified he was flying a Victor 8 airway from Denver to Kremmling, a heading of about 260 degrees. He had aboard the aircraft as navigational aids an IFR chart and a Cheyenne sectional map. The IFR chart indicated a safe minimum altitude for this airway of 16,000 feet, and 14,900 feet was the minimum altitude at which radio communications were certain. The sectional map showed the highest terrain feature on the V-8 airway at 12,700 feet. Defendant testified at the time of the crash he was somewhat north of the airway, and the highest terrain feature in the vicinity was at 11,500 feet. FAA regulations require a 500-foot elevation over the surface of uncongested areas except when landing or taking off. Defendant had flown by Denver at an altitude of 8,500 feet and then began to climb to cross the mountains. Defendant testified and admitted in a deposition that about 10 minutes before the crash he was "struggling for altitude" between 11,000 and

12,000 feet, and that he caught an updraft and felt he "had it made." Defendant was unsure of his altitude immediately before the crash, but felt it was 12,500 or 13,000 feet. A few seconds before the actual impact, the aircraft experienced a downdraft. Both the defendant, himself, and the plaintiff's experts testified downdrafts should be expected on the easterly slopes of these mountains, for the reason prevailing westerly winds spill over the mountains much as water spills over a dam. Defendant testified he had experienced downdrafts before, but none as strong and violent as this one. The crash occurred approximately 30 to 40 miles west, and north, of Denver.

The experts called by the plaintiff testified as to various precautions and standards reasonable and prudent pilots would employ in mountain flying. Some of these included approaching a mountain range at a 45 degree angle so a turn of less than 180 degrees is required to abort the attempt, to maintain a crossing elevation of 2,000 feet over the highest terrain feature as a cushion against possible downdrafts, and to reach the crossing altitude 30 miles away so there is sufficient time and distance to abort the attempt if the altitude cannot be reached. Although certain characteristics of the defendant's aircraft are not in evidence, such as rate of climb, airspeed, etc., both of plaintiff's experts testified that defendant was taxing the capabilities of this particular type of aircraft in flying this route, and that neither one of them would have attempted it. Both experts testified in their opinion the crash was caused by pilot error. Defendant called no expert witnesses.

We recognize that jurors are not required to take the opinions of experts as binding. But where practices and procedures used by pilots in the exercise of ordinary care are not within the general knowledge of jurors, expert testimony is generally needed.

Plaintiff provided such testimony as to both negligence and causal connection, and the defendant offered no rebuttal as to the practices and procedures. It is abundantly clear that the defendant was negligent in the operation of the aircraft as a matter of law because he proceeded ahead, relying upon updrafts to get his plane over the heights ahead and not upon the capabilities of his airplane. Furthermore, he did this in an area where he knew downdrafts could be expected and after he had adequate factual warning of the danger by reason of the previous struggle to gain altitude at a time when the plane was not yet high enough to clear the mountains ahead. It does not follow, however, that plaintiff was entitled to a directed verdict of liability. Such a motion encompasses both aspects of negligence and causal connection. Although the question of causal connection, or proximate cause, is very close, it would appear that the testimony of the defendant as to the severity of the downdraft, if believed by the jury, could result in a conclusion that the downdraft was the *sole* proximate cause of the accident. In addressing the motion and the trial court's ruling, all controverted evidence and legitimate inferences therefrom are resolved in favor of the defendant. Jensen v. Shadegg, 198 Neb. 139, 251 N. W. 2d 880; Waegli v. Caterpillar Tractor Co., 197 Neb. 824, 251 N. W. 2d 370; Middleton v. Nichols, 178 Neb. 282, 132 N. W. 2d 882. It would appear plaintiff's motion for a directed verdict was properly denied because the causal connection between the defendant's negligence and the crash was not established as a matter of law.

A more difficult question is presented by plaintiff's second assignment of error — that the trial court erred in instructing the jury on the doctrine of sudden emergency. NJI No. 3.09. No claim is made and no evidence was introduced to show the defendant negligent in the operation of the aircraft *after* he

encountered the final downdraft. More simply stated, the only issue on liability is whether the downdraft was the *sole* proximate cause of the crash, or whether the negligence of the defendant was *a* proximate, or proximately contributing, cause of the crash. The doctrine of sudden emergency applies only when an individual, first becoming aware of an emergency and faced with a rapid choice of alternative courses, selects a course which mature judgment and deliberation would show to be erroneous or negligent. Kraft v. Fundum, 175 Neb. 821, 124 N. W. 2d 225, citing Feck's Adm'r v. Bell Line, Inc., 284 Ky. 288, 144 S. W. 2d 483; 65 C. J. S., Negligence, § 17, p. 603. Bedke v. Kucera, 200 Neb. 380, 263 N. W. 2d 830, decided this term, is distinguishable on its facts. In that case, the allegations and evidence dealt with negligent acts, both before and after the alleged emergency.

The doctrine of sudden emergency was not applicable to this case and it was error to instruct upon it because the evidence supports only the conclusion that defendant brought the emergency upon himself or he did not use due care to avoid that emergency. Coyle v. Stopak, 165 Neb. 594, 86 N. W. 2d 758. The giving of an erroneous instruction, however, is not necessarily prejudicial. Leonhardt v. Harimon, 185 Neb. 224, 174 N. W. 2d 926. Unless it appears from the record that an incorrect instruction did not affect the result of the trial unfavorably to the party affected by it, the giving of the instruction must be considered prejudicial error. Raile v. Toews, 165 Neb. 184, 84 N. W. 2d 199; Van Wye v. Wagner, 163 Neb. 205, 79 N. W. 2d 281; Long v. Whalen, 160 Neb. 813, 71 N. W. 2d 496. The apposite statement of this rule is that it is error without prejudice to instruct on questions not raised by pleadings or applicable evidence when the instruction does not have a tendency to mislead the jury. Bailey v. Spindler, 161 Neb. 563, 74 N. W. 2d 344. Although a close reading

and a technical application of the sudden emergency instruction would show it applied only to actions of the defendant *after* the downdraft had been encountered, one cannot overlook that the very purpose of such an instruction is to lower the standard of care for an allegedly negligent defendant, i.e., identical actions being negligent at one time and not at another. Under these circumstances we cannot say the record shows such an instruction did not affect the result of the trial. Therefore, the judgment must be reversed and the cause remanded for a new trial.

REVERSED AND REMANDED.