DOUGLAS N. FLETCHER, APPELLEE, V. STATE OF NEBRASKA, DEPARTMENT OF ROADS, ET AL., APPELLANTS.

344 N.W.2d 899

Filed February 3, 1984. No. 82-554.

Paul L. Douglas, Attorney General, and John R. Thompson, for appellants.

John H. Bernstein of Higgins, Okun & Bernstein, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, and SHANAHAN, JJ., and GRANT, D.J.

GRANT, D.J.

Plaintiff, Douglas N. Fletcher, brought this action to recover for his personal injuries incurred when a pickup truck in which he was riding as a passenger was driven into a bridge abutment at the entrance to

a bridge. Plaintiff properly filed his tort claim under Neb. Rev. Stat. §§ 81-8,209 et seq. (Reissue 1981). After denial of his claim plaintiff filed his amended petition alleging generally that the accident and his resulting injuries were proximately caused by the negligence of defendants, State of Nebraska, Department of Roads, and the State of Nebraska (hereinafter collectively defendant), in "permitting unreasonable delays by their contractors of the repairs and maintenance of the approach to said bridge," in "negligently and carelessly permitting the contractor to remove the existing guardrails for an unreasonable period of time," and in failing to install and maintain safety beam guardrails on the approach to the bridge. Trial was had to the district court, sitting without a jury, as required by § 81-8,214. The court found for the plaintiff, made certain "conclusions of fact," and entered judgment against defendant for $741,859.46. Defendant appeals.

With regard to plaintiff's allegations concerning "permitting unreasonable delays," the trial court found that "[d]efendant was negligent in failing to supervise and/or take appropriation action against the Nider-Jergensen Construction Company to prevent the unreasonable delays in this project" and "in permitting the Nider-Jergensen Construction Company to remove the guardrail in question for an unreasonable period of time," and that each recited act of negligence "was a proximately-contributing cause of the injuries sustained by the plaintiff." Lengthy testimony was adduced at the trial to establish that on March 21, 1977, a contract was executed between defendant and Nider-Jergensen to resurface and generally rebuild some 4 miles of roadway on U.S. Highway 6 from the vicinity of the Platte River to the junction of Highway 31 and Highway 6. On the same day, defendant entered into a contract with Joseph T. Grof Construction Company to erect new guardrails at bridge 34157, a bridge over a stream just east of the Platte River, the site of the

accident. Various dates of beginning work were established, such as July 25, 1977, for Nider-Jergensen's asphalting, and September 6, 1977, for Grof's guardrail work. For unexplained reasons Nider-Jergensen did not complete its work within the contractual 25 working days, and indeed did not complete its contract until November 23, 1977, on which date the project was "temporarily suspended" by the State, due to winter conditions. On December 12, 1977, defendant advised Nider-Jergensen that the State had accepted Nider-Jergensen's work as of November 23, 1977, and that the company was relieved of further responsibility for the job. During the course of its contract, Nider-Jergensen had removed the guardrails at the bridge in question on October 5 and 6, 1977. Grof was not called on to install the new guardrails on the bridge until May of 1978. The accident in question happened on December 16, 1977.

Insofar as the trial court predicated defendant's liability for plaintiff's injuries on defendant's action or lack of action under contracts with third parties, such holding is in error. Only legal confusion could result if members of the general traveling public were in some way considered to be third-party beneficiaries of every construction contract entered into by the State of Nebraska with outside contractors, or if it be determined that the duty the State owes to the traveling public could be measured by the State's performance under such contracts. The actions of the State in entering into, and in the performance under, such contracts are "discretionary functions" of the State and cannot afford the general public a basis for tort claims negligence actions against the State. In *Dalehite v. United States*, 346 U.S. 15, 73 S. Ct. 956, 97 L. Ed. 1427 (1953), the U.S. Supreme Court considered the "discretionary function" exclusion of the Federal Tort Claims Act. That exclusion, as set out in 28 U.S.C. § 2680 (1976), is essentially the same as § 81-8,219(1)(a), which provides that the provisions of the State Tort Claims

Act shall not apply to any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency . . . ."

In *Dalehite, supra* at 35-36, the Court stated: "It [a discretionary function] also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations." Negligence against the State ordinarily cannot be predicated on the State's alleged failure to "take appropriate action" against a construction company for contractual delays alleged to be unreasonable. Such appropriate actions are the responsibility of the executive branch of the government, and the ultimate control over such action or inaction is at the ballot box, not in individual negligence cases.

Such a disposition of the first two findings of negligence, however, does not in any way dispose of this case, but that disposition does clear away unnecessary underbrush. The basic holding of the trial court in determining responsibility in this case rests on the trial court's finding that "[d]efendant was negligent in maintaining this location in an unreasonably unsafe condition, to-wit: with an exposed bridge rail, unprotected by a guardrail, barricades, or other temporary protective devices, and such negligence was a proximately-contributing cause of the injuries sustained by the plaintiff." Such a finding, if legally proper and factually supported by the evidence, would determine a violation of defendant's duty to the traveling public, which the trial court had properly determined to be the duty "to maintain its highways in a reasonably safe condition for travel by persons using the same, and to use ordinary care to protect such persons from dangerous places near the traveled portion thereof." That statement accurately reflects Nebraska law as set out in *Clouse v. County of Dawson*, 161 Neb. 544, 74 N.W.2d 67 (1955), *King v. Douglas County*, 114 Neb.

477, 208 N.W. 120 (1926), and *Richardson & Gillispie v. State*, 200 Neb. 225, 263 N.W.2d 442 (1978), *supp. op.* 200 Neb. 781, 265 N.W.2d 457.

In this case defendant had released Nider-Jergensen from all responsibility and had accepted its work as of November 23, 1977, and the defendant had chosen not to require guardrails to be installed until the following spring. Defendant's "discretionary function" planning in that regard may not be the basis for a tort claims action, but defendant's actual conduct in maintaining its highways and bridges as it did after the contractor was released falls squarely within the State Tort Claims Act.

The facts in that regard follow. As set out above, guardrails on the approach to the bridge in question had been removed on October 5 and 6, 1977. The bridge was without guardrails until new guardrails were installed in May of 1978. The trial court found that defendant had posted "some signs, notices or warnings, but no conclusion is reached as to the adequacy thereof."

Taking that somewhat truncated finding, the record may fairly be said to show that defendant had installed a "soft-shoulder" sign approximately two-tenths of a mile west of the bridge, at least three delineator 3-inch circular reflectors approximately 25 feet apart and starting 150 feet west of the bridge, and three bridge hazard signs. The last of the three bridge hazard signs was at the bridge abutment itself, and since the bridge was 26.5 feet wide, and thus wider than the road's 24-foot width, this one bridge hazard sign satisfied both the state and federal manual requirements as to bridge warning signs where the width of the bridge exceeds the width of the highway. The remaining two bridge hazard signs were approximately 25 feet and 50 feet to the west of the abutment sign itself. We determine that since there was compliance with the U.S. Department of Transportation/Federal Highway Administration Manual on Uniform Traffic Control De-

vices for Streets and Highways (1971) (adopted by the Legislature of the State of Nebraska), the signs were adequate to warn the traveling public of the upcoming bridge. In view of our disposition of the case, and the nature of the trial court's findings, we need not determine whether that conclusion was sufficient to discharge the State from liability.

Further facts as to which there is no dispute are that no guardrails, barricades, or other temporary protective devices were present. The evidence further shows that there was a steep decline beginning at the outer edge of the shoulder of the road near the bridge and that at the bridge itself that decline went sharply down over large rocks to a stream of water.

On December 16, 1977, plaintiff had just completed his season as a foreman for the Burlington Northern railroad. Since that night was the last that the labor gang would work together for the season, a group of the workers met at a tavern in Ashland, Nebraska, at about 5 p.m. Both plaintiff and Robert Sharp were in the group. Mr. Sharp was to give plaintiff a ride to Sharp's home near Washington, Nebraska, where plaintiff's wife was to meet plaintiff and return to their home in Fremont. Plaintiff and Mr. Sharp were drinking beer at the rate of approximately one to two beers per hour until they left the tavern at some time between 8 p.m. (Mr. Sharp's testimony) and 9:30 p.m. (the rescue squad was notified at 9:36 p.m.). The two got into Mr. Sharp's four-wheel-drive pickup truck and proceeded east on Highway 6 toward the bridge in question, some 4 miles to the east, with Mr. Sharp driving and plaintiff in the passenger's seat.

As the vehicle neared the bridge, Mr. Sharp was adjusting the truck radio. While he was so engaged, the right wheels of the truck left the pavement. The truck proceeded toward the bridge abutment, and after traveling approximately 50 to 100 feet, and without any application of brakes, collided with the abutment at a speed of between 55 m.p.h. (as re-

membered by the driver) and 63 m.p.h. (as testified to by defendant's expert witness).

The highway at the entrance to the bridge was 24 feet wide, the bridge was 26.5 feet wide, and the railing was on the bridge parapet another few inches to the south. Thus, the extended railing was approximately 2 feet 6 inches south of the south edge of the highway pavement, extending toward eastbound traffic. The railing was metal, and curved away from the road at the end. At the impact this bridge railing went into the right front of the truck, entering the body of the truck some 6 inches to the left of the right front wheel, penetrating along the passenger's side of the engine, through the firewall, and up through the passenger's space in the truck's cab, and going out through the roof of the cab.

Plaintiff suffered severe injuries, primarily in that he incurred a partial loss of use of his right arm. He had not returned to work at the time of the trial in 1982.

In support of his position that defendant was negligent, plaintiff had the burden of proving that the installation of the guardrail would have prevented his injury and that the failure to install such a guardrail was therefore the proximate cause, or a proximately contributing cause, of his injuries. To sustain that burden plaintiff adduced evidence in the form of an opinion from Richard Large, a qualified engineer and an "accident-reconstruction" expert. Mr. Large testified that he was familiar "to some extent" with the purpose of the placement of guardrails and warning signs in connection with highways and bridges and that he was familiar with the type of guardrail ultimately installed at the bridge in question "[o]nly to the extent that I have seen them."

The following portion of the cross-examination of the expert witness fairly reflects the knowledge and expertise of the witness as to this particular incident. "Q. Do you know what the center of gravity

of the vehicle in question was? A. Between the wheels or vertically? Q. The vertical center of gravity. A. No, I don't. Q. So you didn't use that in your determinations at all? A. No, I didn't. Q. . . . Did you make any study at all, scientific or mathematical calculations or determinations, as to the possibility of vaulting or rolling over the guard rail had it been there? A. I've referenced some information with respect to that, yes. But I have not made an independent analysis of that. Q. Did the information you referenced have anything to do with the — did it specifically relate to a vehicle of the type, weight, and center of gravity of the vehicle in question? A. I don't know. It related to the weights, center of gravity is not given, except in cases where there were large vehicles involved, where I'm sure that the center of gravity would be higher than a passenger car. Q. So to make an accurate conclusion from any study, you would have to know the center of gravity and weight and other unusual characteristics of the vehicle as opposed to a passenger vehicle, wouldn't you, passenger car? A. Well, you have to know a lot more data than that, but that should be taken into consideration, yes. . . . Q. . . . And as I understand it then, you did not make any study taking any of those things into consideration? A. Well, as I indicated to you before, I have referenced some tables that concerned the results of a lot of barrier impact tests, and that's the extent of what I've done. Q. But not with specific reference to details on this particular vehicle? A. As I indicated, the center of gravity, vertical location, was not given. Q. Okay. Did you make any studies to determine if the ground were frozen to various depths, whether the guard rail posts would consume the energy of the encroaching vehicle or possibly snap? A. Well, I think you have to be more definitive about your question. *I haven't made any studies with respect to this guard rail system concerning a vehicle colliding with it*, so I

haven't done that either." (Emphasis supplied.)

In addition, careful review of the record shows that with regard to the factual basis on which he predicated his testimony the expert witness studied the accident scene photographs, other photographs of the scene taken later, drawings of the proposed construction, and the weekly working day reports of the contractors. Nowhere in his testimony did the witness ever state that he knew and based his opinion evidence on what kind of a vehicle was involved, the weight and height of such a vehicle, whether seatbelts were being used, the height of the guardrail, or the speed of the car at the moment it would have struck the nonexistent guardrail.

As later testimony developed, guardrails are designed primarily for the protection of passenger cars. Although much of his testimony was excluded, defendant's expert did present data as to the higher vertical center of gravity of a 1976 Chevrolet four-wheel-drive, short wheelbase pickup truck, which had larger-than-standard tires and heavy-duty springs—a vehicle of the type driven by Mr. Sharp. The general effect of a portion of testimony admitted from defendant's expert witness indicated, at the least, that the higher center of gravity and bumper configuration presented a different factual problem than presented by a passenger car running into a guardrail and that the speed of a vehicle running into a guardrail was important.

Nonetheless, over objection, plaintiff's expert witness was permitted to testify, in answer to a question as to his opinion as to the difference "in terms of potential injuries that could occur when a vehicle strikes a bridge rail and potential injuries that could occur when a vehicle strikes a guard rail," as follows: "If there is a guard rail installed, such as was installed after this accident, and with a vehicle running essentially parallel to the roadway and trying to get back up to the roadway, it would have deflected it back onto the bridge and there wouldn't

have been any injuries involved. There would have been some damage to the pickup, but no injuries to the passenger at that location."

We recognize that Neb. Rev. Stat. § 27-705 (Cum. Supp. 1982) provides that "[t]he expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." We have stated that "[e]xpert testimony should not be received if it appears the witness is not in possession of such facts as will enable him to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture." *Clearwater Corp. v. City of Lincoln*, 202 Neb. 796, 804, 277 N.W.2d 236, 241 (1979), quoted with approval in *Langfeld v. Department of Roads*, 213 Neb. 15, 328 N.W.2d 452 (1982).

In the instant case plaintiff's witness was permitted to testify, over objection, that the presence of guardrails would have resulted in the truck in effect being diverted back into its proper lane of travel with "no injuries to the passenger."

Further, the expert was required by § 27-705, on cross-examination, "to disclose the underlying facts or data" for his opinion. In this case the witness not only did not disclose such data but affirmatively established that he had no such data. There may well be the fortuitous, safe result testified to by the expert if a vehicle strikes a guardrail at a speed of 10 m.p.h., but it is pure speculation that the same safe result will follow when a pickup truck hits any fixed object at a speed of 55 m.p.h.

To show that guardrails are not the complete answer to all such accidents, and only as an example, we note the factual statement and factual result in *Shover v. General Motors Corp.*, 198 Neb. 470, 471, 253 N.W.2d 299, 301 (1977), where the facts were set out as follows: "The accident occurred when the

right front corner of the station wagon struck a guardrail on the right side of the highway. The station wagon continued along the guardrail until the right front struck the pier or abutment of an overpass. The rear of the station wagon then swung around to the west and the station wagon skidded across the highway and into the median where it overturned. The driver and all the passengers were injured. Roy sustained very severe injuries in the accident.'' In that case the vehicle was traveling at 65 m.p.h.

In this case there was no ''reconstruction'' of an accident that had occurred. Instead, on the flimsy data apparently considered by the witness, an accident was ''constructed'' or created. The expert gave no reasons for his opinion, and his conclusions are pure speculation and totally insufficient to form a basis for any opinion. The opinion testimony of plaintiff's expert witness had no proper foundation and should have been excluded.

As stated in *Northern Nat. Gas Co. v. Beech Aircraft Corp.*, 202 Neb. 300, 306-07, 275 N.W.2d 77, 81 (1979), ''If an expert witness is to be permitted to render an opinion without prior disclosure of the underlying facts or data upon which his opinion is based, then the expert must at least establish by competent evidence that the matter involved in the opinion is of such nature that experts within the specific field could render an opinion. Moreover, when requested by the trial court, such expert should be required to produce sufficient evidence to establish that the underlying facts or data are of such a nature that an expert in the particular field would use or would rely upon such facts to reach a conclusion. Flory v. Holtz, 176 Neb. 531, 126 N.W.2d 686; Brugh v. Peterson, 183 Neb. 190, 159 N.W.2d 321.''

Without such evidence plaintiff has not carried his burden of proof to establish that any action or inaction of defendant was a proximately contributing cause of plaintiff's injuries. The trial court prop-

erly determined that the driver of the pickup truck "was negligent in the operation of his vehicle by exceeding the speed which was reasonable and proper under the conditions existing, by failing to maintain a proper lookout, and by failing to keep his vehicle under reasonable control," but the court erred in failing to find that the negligence of the driver was the sole proximate cause of the accident and plaintiff's injuries.

In this connection we note the case of *Brown v. State*, 205 Neb. 332, 287 N.W.2d 676 (1980), where the facts were very similar to this case. In *Brown* a young driver drove into a bridge abutment, after first driving off the paved portion of the highway several times. This collision resulted in the death of the plaintiff's son. In the *Brown* case, as in this case, the guardrails to the bridge had not been installed at the time of the accident. In *Brown*, however, even more facts were stipulated; namely, the loaded weight of the passenger automobile, and the fact that, under the design specifications of the guardrail for the bridge, the guardrail would withstand an impact greater than that which the Brown automobile and occupants would exert on the guardrail even at a speed greater than that at which the automobile was traveling. We held at 337, 287 N.W.2d at 680, "While evidence was introduced as to the purpose and function of guardrails, the record contains nothing which would indicate conclusively that had the guardrails been in position at the time of the accident the resulting accident and death of the decedent would not have occurred." We recognize that in *Brown* we affirmed the decision of the trial court that the sole proximate cause of the accident was the negligence of the driver. In the present case, where there is no admissible evidence to support the contrary decision of the trial court, the same decision must be reached.

The plaintiff has not met his burden of proof. There is no proof that defendant's actions, if negli-

gent, were a proximately contributing cause of the accident, and, on the contrary, the facts show that the sole proximate cause of the accident was the negligence of the driver of the car in which plaintiff was riding. The case must be dismissed.

REVERSED AND DISMISSED.