TERRY W. TANK ET AL., APPELLANTS, V. STEVEN M. PETERSON, PERSONAL REPRESENTATIVE OF THE ESTATE OF DONALD E. PETERSON, DECEASED, ET AL., APPELLEES.

363 N.W.2d 530

Filed March 8, 1985.   No. 83-913.

James R. Welsh and E. Terry Sibbernsen of Welsh, Sibbernsen & Roach, for appellants.

William G. Line and John F. Kerrigan of Kerrigan, Line & Martin, for appellees.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

WHITE, J.

This is a wrongful death action arising out of an airplane crash. The suits were brought by the personal representatives of the estate of Willis H. and Marva Lea Tank, both deceased, against the personal representative of the estate of Donald E. Peterson, deceased, a partnership doing business as Don Peterson & Assoc. Steel Bldg. Co., and Douglas F. Steenblock,

a partner in the company.

This case was previously before this court on a different question. See *Tank v. Peterson*, 214 Neb. 34, 332 N.W.2d 669 (1983).

After the plaintiffs had presented their case in chief, the trial court sustained the respective motions for directed verdict on behalf of the partnership and Steenblock on the grounds that "the plaintiff's evidence did not show the fatal trip was a business one." No errors are assigned concerning this ruling, and, as such, it is not an issue in this appeal. The trial court also sustained Steven Peterson's motion to strike the testimony of three expert witnesses of the plaintiffs. The court then sustained Peterson's motion for directed verdict. It is the propriety of these latter two rulings which constitutes the issues in this appeal.

The record reveals that on November 25, 1979, the plaintiffs' decedents, Willis H. and Marva Lea Tank, were passengers in a 1967 twin-engine Piper Aztec aircraft allegedly piloted by Donald E. Peterson. The plane was last seen at approximately 7 p.m. on that day departing from runway 32 at the Columbus, Nebraska, airport. The wreckage of the plane was discovered the next morning approximately 2 miles northeast of the Columbus airport. There were no eyewitnesses to the crash. All persons aboard were killed.

In plaintiffs' second amended petition they alleged 19 specific acts of negligent conduct of Donald Peterson as the direct and proximate cause of the deaths of Willis and Marva Tank.

The facts as to the alleged cause of the crash are contained primarily in the testimony of the plaintiffs' three expert witnesses. By order of the trial court this testimony was struck on the basis that "the opinions of the witnesses were based upon improper and invalid assumptions and considerations, upon facts not in evidence and which were beyond the knowledge and expertise of the witness; and that the opinions and testimony were so speculative and conjectural as to have no probative value."

We set forth an extended version of the facts, keeping in mind that in reviewing the sustaining of a motion for a directed

verdict, the evidence will be construed most strictly against the moving party and in favor of the party against whom the verdict was granted. *Eden v. Spaulding*, 218 Neb. 799, 359 N.W.2d 758 (1984).

On the evening of November 25, 1979, the plaintiffs' decedents were passengers on an airplane allegedly piloted by Donald E. Peterson. At approximately 7 p.m. on that evening, the twin-engine 1967 Piper Aztec airplane departed runway 32 of the Columbus airport. George Poullos, who arrived at the airport when the Piper departed, testified by way of deposition that he had just flown into the Columbus airport from Greeley, Colorado, approximately 20 minutes prior to the Piper's departure. Poullos heard the Piper depart approximately 3 to 5 minutes after Peterson started the engines. Poullos, an experienced pilot, testified that in his opinion this was insufficient time for Peterson to "do a complete run-up, cockpit check and allow the engines to reach normal operating temperatures."

The Piper, having failed to reach its supposed destination of Fremont, Nebraska, was reported missing in the early morning hours of November 26, 1979. A search and rescue party was formed in order to locate the airplane and its occupants. Gerald Lee Eskilsen and two other friends departed from the Fremont airport in search of the plane. After unsuccessful attempts in locating the plane between the Columbus and Fremont airports, the search plane made a low pass over runway 32. The search plane then made a right-hand turn toward Fremont, as the occupants had assumed Peterson would have done. As the search plane was in the process of the right-hand turn, the wreckage of the Piper was observed. All six occupants of the Piper were dead.

The National Transportation Safety Board (NTSB) investigative report revealed that the wreckage was found in an open field approximately 2 miles northeast of the Columbus airport. The plane crashed at a 60° nosedown position. Severe disintegration occurred at the point of initial impact, and pieces of debris were scattered over about a 150-foot diameter area. Upon a later investigation the plane's engines were disassembled and inspected. The spark plugs were clean and

serviceable, and the magnetos were capable of normal operation. Compression was found on all cylinders, and the power drives for the two engines were intact to the accessory sections. The vacuum pump drives on both engines were also intact and the pumps free to operate. In short, the investigation failed to disclose any evidence of an aircraft in flight malfunction or failure.

The NTSB report indicated that at 6:40 p.m. on November 25, 1979, surface observations at the Columbus airport showed an estimated cloud ceiling of 1,000 feet broken, 5,000 feet overcast, visibility 7 miles, temperature 34° F, dewpoint 26° F, wind 333° at 10 knots, gusting to 15. Several witnesses stated that there were misty conditions in Columbus at or about the time the Piper departed. Poullos testified that when he landed at the Columbus airport, it was very hazy, visibility was restricted, and there were areas of scud. Poullos defined scud as a localized area of clouds lying below the rest of the clouds.

The NTSB report also indicated that although an occupant of the Piper had attempted to obtain weather briefing from the Lincoln flight service station, no weather briefing was obtained because of broken radio transmissions. Peterson did not file an instrument flight rules (IFR) flight plan.

Concerning Peterson's qualifications to fly an aircraft, the NTSB report revealed that Peterson possessed a private pilot's license in which he was certified to fly single-engine and multiengine planes. The report also revealed that at one point Peterson had obtained his IFR rating. According to Peterson's pilot logbooks, he had accumulated 764 hours of total pilot experience, of which 390 hours were in the Piper. Peterson's logbooks showed 38 hours of total night flying experience, of which 1 hour and 15 minutes was in the previous 12 months. Peterson had logged a total of 10 minutes' actual instrument time in the previous 12 months. His most recent biennial flight review was dated July 7, 1977. Peterson flew an average of only 3 hours per month the year prior to the accident.

At the time the Piper departed from the airport, marginal visual flight rules (VFR) conditions existed. Poullos explained that marginal VFR conditions exist when the cloud ceiling is between 1,000 and 3,000 feet and visibility is between 3 to 5

miles. It was Poullos' belief that after the Piper was airborne Peterson initiated a right-hand turn even though the proper procedure would have been a left-hand turn. The record reveals the following:

Q. [By Mr. Welsh] All right. Mr. Poullos, based upon your experience as a pilot and your experience in operating a Piper Aztec aircraft similar to the make and model being operated by Mr. Peterson on November 25th, 1979, and based upon your knowledge of the weather conditions as they existed in Columbus, Nebraska, on November 25th, 1979, at approximately 7:00 p.m., and further based upon your review of the NTSB report filed in connection with this accident, do you have an opinion you can state with a reasonable degree of aviation certainty as to what was the proximate cause of this accident which took place on November 25, 1979?

A. It's strictly my opinion?

MR. LINE: I will withdraw the objection I made at the time. You can go ahead.

Q. Go ahead.

A. Answer?

Q. Sure.

A. Based upon my experience I think spatial disorientation.

Q. Okay. What do you mean by spatial disorientation?

A. When you're flying VFR, the term VFR is an abbreviation for visual flight rules. You have to be legal and safe. You fly the aircraft by reference to the horizon. When you fly IFR, which is an abbreviation for instrument flight rules, you fly by reference to your instruments. When you don't have a visual — what's the phrase I want to use — When you don't have something that you can see to guide you visually, then you — obviously you have to use your instruments. The situation in Columbus is the big black hole. There's nothing to provide you with any — provide your senses with anything to use as a guide in flying. So, consequently, you have to go on instruments. The problem is that most pilots that are not trained suffer vertigo or spatial disorientation. They

try to fly the aircraft by looking at instruments. They try to fly the aircraft with no middle ear clues as to what they're doing.

So, with no visual reference whatsoever, and presuming that he did not believe his instruments, if he was looking at his instruments, I'm of the opinion he suffered vertigo, spatial disorientation.

Maybe he thought the airplane was going one way and reacted the opposite direction from the reading. I did read where the aircraft impacted at a 60-degree back or 60-degree pitch down. If the aircraft stalled he perceived he was driving the stalled aircraft and it's not conceivable to me that he could physically push the aircraft into a 60-degree descent.

Q. Okay.

A. But, that's why it's just based on — especially the black hole. It's tough. It's very difficult. It's just about impossible to fly in that situation. It's almost impossible to fly in that situation VFR. You have to use your instruments. In that type of situation will tax some of the most proficient pilots.

The plaintiffs also called a Gary Blessing to help explain how the accident might have occurred. Blessing testified that the normal traffic pattern for an aircraft consists entirely of left-hand turns but that the Piper's point of impact was consistent with a right-hand turn. Blessing further opined that although it was possible that Peterson initiated a left-hand turn, it was not reasonable when considering the point of impact.

Blessing noted that Peterson violated several Federal Aviation Administration (FAA) regulations on the night of November 25, 1979. He testified that under an FAA regulation a pilot may not carry passengers between 1 hour after sunset and 1 hour before sunrise unless, within the preceding 90 days, he has made at least three night takeoffs and landings during that period. See 14 C.F.R. § 61.57 (1984). Blessing stated that the reason for this rule is that a pilot's depth perception changes at night for takeoffs and landings, and a pilot must be more skilled and proficient to fly safely at night.

Section 61.57 requires that no person may act as a pilot

unless, within the preceding 24 months, he has passed a flight review given to him by an appropriate certified instructor. The same regulation requires that no pilot may fly IFR, nor in weather conditions less than the minimum prescribed for VFR, unless the pilot has logged at least 6 hours of instrument time in the last 6 months. This must also include at least six instrument approaches. Another FAA regulation provides that no pilot may take off without first checking the weather. See 14 C.F.R. § 91.5 (1984).

Blessing stated that although Peterson was not legally obligated to fly IFR that night, a pilot with Peterson's limited experience and lack of currency should not have taken off from the airport in the first instance. Blessing testified that Peterson was "pretty much foolhardy to get in the airplane and even try it." He testified that Peterson completely disregarded the rules for licensing, keeping current, and maintaining proficiency.

It was Blessing's opinion, based on the NTSB report, Peterson's pilot logbooks, the depositions of the other expert witnesses, and his own training and experience, that upon taking off Peterson initiated a right-hand turn, suffered spatial disorientation, and, because of his lack of experience, lost control of the aircraft and literally drove the Piper into the ground.

It was Blessing's conclusion that a combination of numerous pilot errors, amounting to gross negligence, caused the accident.

Gregory Gorak, who also qualified as an expert witness, stated that the FAA regulations are the minimum requirements that a pilot must meet in order to fly safely. He stated that although it would have been legal to fly VFR at the time of the takeoff, a prudent pilot would have flown IFR or not at all. Gorak stated that Peterson operated the plane in a careless manner and that the cause of the accident was pilot error. The cause of the crash, in Gorak's opinion, was that Peterson

in this climb-out encountered deteriorating weather conditions, probably entered the clouds, became spatially disoriented, really didn't know what the attitude of his aircraft was in relationship to the rest of the earth, and lost the airplane. . . . [Peterson] forgot all his training, which is

understandable simply because he refused to remain current in his training.

Gorak testified that spatial disorientation "happens most often at night to a VFR-type pilot. And it happens most often when pilots inadvertently enter clouds." He emphasized that training and frequent flying are needed to maintain proficiency in order to avoid the hazardous results of spatial disorientation. Gorak was of the opinion that because Peterson was not current in his instrument rating, not current in his night flight requirements, not current in his biennial review, and because Peterson had little flying experience in conditions similar to those existing the night of the fatal crash, Peterson was an unsafe pilot and was negligent in even attempting to depart the Columbus airport.

Throughout cross-examination Gorak remained firm in his belief that the accident was a result of pilot error. Gorak testified that he formed his opinion after reviewing the NTSB report, the FAA regulations, the operations manual for the Piper, Peterson's logbooks, the Piper's engine logbooks, and the depositions of Poullos and Blessing.

A trial court's ruling accepting or rejecting evidence will not be disturbed unless there is shown to be a clear abuse of discretion. Expert testimony should be stricken if it appears that the witness is not in possession of such facts as will enable him to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture. *Fletcher v. State*, 216 Neb. 342, 344 N.W.2d 899 (1984); *Northern Nat. Gas Co. v. Beech Aircraft Corp.*, 202 Neb. 300, 275 N.W.2d 77 (1979).

No contention is made that the plaintiffs' experts lacked the requisite qualifications to testify concerning the cause of the crash, nor that the expert testimony was not needed to assist the trier of fact to understand the evidence or determine a fact in issue. See *Oban v. Bossard*, 201 Neb. 243, 267 N.W.2d 507 (1978).

It is a tragic characteristic of airplane crashes that the accident itself frequently destroys all evidence of the cause and kills the witnesses who might have knowledge of the event. Consequently, in litigation arising out of a plane

crash the rights of the parties often depend upon the attitude of the court with respect to the right of the jury to draw inferences from such evidence as has survived the disaster.

*Lange v. Nelson-Ryan Flight Service, Inc.*, 259 Minn. 460, 462, 108 N.W.2d 428, 430 (1961).

All of the plaintiffs' expert witnesses testified that Peterson violated numerous FAA rules and regulations on the night of the crash. The experts testified, based on a review of Peterson's logbooks, that Peterson had gone beyond his biennial review date, had allowed his instrument rating to lapse, and was not current to carry passengers on a nighttime flight. The experts further testified, based on the NTSB report, that Peterson had violated § 91.5 in that he did not receive a preflight weather report that evening.

The appellees argue that

> [a]ny violation of a federal regulation here constituted a paper-work violation—a failure of Peterson's log to note that he had completed all flights required within a given time to maintain the currency of his instrument rating or night flying currency. Also, according to the log, Peterson was a little over two months past-due for his biennial flight review.
>
> There is no proof that Peterson had not actually completed all flights required to maintain instrument and night currency or that Peterson had not taken his biennial flight review. The plaintiffs only proved he failed to write it down.

Brief for Appellees at 20-21.

Delbert Valle, the NTSB accident investigator, testified that the purpose of a pilot's logbook, a record required by the FAA, is to ascertain whether a pilot is current or not current for the various pilot ratings. Blessing testified that his opinions were based on a review of Peterson's logbook. Nothing in the record indicates that the logbook was incomplete.

The jury could, subject of course to the defendants' rebuttal, infer that Peterson did not complete the requisite requirements to maintain currency for his biennial flight review, the IFR rating, and the passenger night flying.

The conclusions of the expert witnesses were consistent. In their opinions the cause of the crash was pilot error; the experts' main thesis being that because of Peterson's lack of currency and his inexperience in flying in conditions as they existed at the time of the departure, Peterson, upon takeoff, became spatially disorientated and lost control of the aircraft.

The experts testified that the location of impact and the angle of impact were consistent with the theory of a pilot suffering spatial disorientation and not being able to maintain control of the aircraft.

In addition to their impeccable qualifications, the expert witnesses relied on the NTSB report, Peterson's pilot logbooks, the aircraft engine logbooks, the FAA regulations for pilots, and the operations manual for the Piper Aztec. Two of the three experts also reviewed the other expert witnesses' respective depositions.

The appellees argue that because none of the experts could directly testify as to the length of the flight, speed of the climb, altitude reached, whether the plane encountered clouds, whether the weather was the cause of the accident, when and how often the plane turned, or in which direction it turned, the experts' opinions were speculative and conjectural, and, as such, the trial court was correct in striking them.

> All that plaintiff was required to do was to establish, to a reasonable probability, that the accident happened in the manner alleged in his petition, and where facts and circumstances are established from which the way the accident happened could be logically inferred, it was not error to submit that issue to the jury.

*Markussen v. Mengedoht*, 132 Neb. 472, 475, 272 N.W. 241, 243 (1937).

As previously noted, the experts were of the opinion that Peterson suffered spatial disorientation while initiating his takeoff from the Columbus airport. The point of impact and the degree of impact were consistent with this theory. The defendants' attorney had ample opportunity to fully cross-examine each expert witness. Nowhere does it appear in this cross-examination that the speed of the climb, the altitude reached, how often the plane turned, or whether the weather

was the cause were facts necessary in order for the experts to render their opinions. Unless we speculate on facts not contained in the record, something we cannot do, there is no evidence that these facts were necessary in order for the experts to render their opinions. The experts having given their opinions and the bases thereof, it then became imperative for the defendants to establish that the experts' opinions were based on insufficient underlying facts or data. This simply was not done, and, as such, we hold that the trial court abused its discretion in striking the testimony of the plaintiffs' expert witnesses. The appellees' objections relate solely to weight and credibility of the expert witnesses' testimony and not to its admissibility.

The trial court also indicated that it would have sustained the defendants' motion for directed verdict even if it had overruled the defendants' motion to strike the experts' testimony. "The mere fact that an accident happened in this case does not give rise to an inference of gross negligence on the part of Don Peterson."

Although we agree with the trial court's premise, see *Scarborough v. Aeroservice, Inc.*, 155 Neb. 749, 53 N.W.2d 902 (1952), we do not agree with the conclusion.

A directed verdict is proper only when the facts are conceded, undisputed, or such that reasonable minds can draw but one conclusion. *Stephen v. City of Lincoln*, 209 Neb. 792, 311 N.W.2d 889 (1981).

Viewing the evidence in the light most favorable to the plaintiffs, one of the reasonable inferences a jury could have drawn from the evidence was that Peterson was negligent in undertaking the flight in the first instance. At the time of the crash the weather was deteriorating and was categorized as marginal VFR. Peterson did not obtain a weather report before takeoff. It was a dark night. Peterson was not legal to fly the plane at night with passengers aboard. He was overdue on his biennial flight review and was not current to fly IFR. The plaintiffs' experts also testified as to numerous violations of FAA regulations, and although these violations do not constitute negligence per se, they are evidence of negligence which may be taken into consideration along with all other

evidence. *Scarborough v. Aeroservice, Inc., supra.* The evidence would seem to indicate that the crash was not the result of a mechanical malfunction of the aircraft. The testimony of the expert witnesses, if believed, could lead a jury to conclude that upon Peterson's takeoff from runway 32 he became spatially disorientated and drove the aircraft into the ground. Peterson, knowing that he lacked the requisite qualifications to fly the aircraft safely under the circumstances, apparently disregarded his limitations and flew anyway.

Viewing the evidence from this perspective, we hold that a jury question on the issue of negligence and proximate cause was created, and the trial court erred both in striking the plaintiffs' expert witnesses' testimony and directing a verdict in favor of the defendants.

The plaintiffs here were not required to eliminate all possibilities of how the accident may have happened. Plaintiffs were required only to establish a factual basis to infer negligence on the part of the pilot. The inference is clear in this case; whether the jury would have accepted this inference is yet another matter.

The appellees also assert that under the holding of *Mitchell v. Eyre*, 190 Neb. 182, 206 N.W.2d 839 (1973), they are entitled to a directed verdict because the plaintiffs did not meet their burden of proof as to who was actually flying the plane. Appellees' reliance on *Mitchell* is misplaced. *Mitchell* is easily distinguished on its facts and therefore is not controlling.

In *Mitchell* the occupants of the plane were two experienced pilots. The plane had dual controls and was in flight more than 1 hour prior to the fatal crash. This court, in holding that the trial court should have directed a verdict in favor of the defendant, stated, "Where the aircraft is equipped with dual controls and both occupants are pilots, proof as to who may have been piloting the aircraft at the time of take-off, in our judgment, should not be conclusive where, as here, the crash occurs more than an hour later." *Id.* at 186, 206 N.W.2d at 842.

In the instant case, although the aircraft was equipped with dual controls, Peterson was the only occupant who possessed a pilot's license. The plaintiffs also introduced evidence that would indicate, if believed, that Peterson was seated in the

left-hand seat of the Piper, commonly referred as to the "pilot in command seat." Although the defendants are free to introduce evidence that Peterson was not piloting the aircraft at the time of the crash, an inference could be easily drawn by the jury that Peterson was the pilot in command at all times during the flight. At best, it is a question of fact for the jury to decide who was flying the plane.

The final issue is whether the airplane guest statute, Neb. Rev. Stat. § 3-129.01 (Reissue 1983), is unconstitutional. This court in *Botsch v. Reisdorff*, 193 Neb. 165, 226 N.W.2d 121 (1975), upheld the constitutionality of the automobile guest statute. At least three judges of this court are of the opinion that the airplane guest statute as it existed during all times relevant to this action was constitutional.

REVERSED AND REMANDED FOR A NEW TRIAL.

KRIVOSHA, C.J., concurring in the result.

I am in complete agreement with the majority in this case insofar as it concludes that the action of the trial court should be reversed and remanded. I, however, again write separately with regard to the suggestion by the majority that there are at least three members of the court who would hold the airplane guest statute, Neb. Rev. Stat. § 3-129.01 (Reissue 1983), constitutional. In 1980, writing in *Kreifels v. Wurtele*, 206 Neb. 491, 293 N.W.2d 407 (1980), I expressed my view with regard to the matter generally, concluding that Neb. Rev. Stat. § 39-6,191 (Reissue 1978), the automobile guest statute, was in violation of both the Nebraska Constitution and the U.S. Constitution. Section 3-129.01 is a mirror image of § 39-6,191, except that it applies to aircraft rather than automobiles. I repeated that view again in *Cushing v. Bernhardt*, 210 Neb. 272, 313 N.W.2d 688 (1981). I wish to indicate that my view has not been changed by the passage of time. Quite to the contrary, the action taken by our Legislature in amending § 39-6,191 in 1981 and § 3-129.01 in 1984 has only strengthened my resolve.

I am authorized to state that GRANT, J., joins in this concurrence.

BOSLAUGH, J., dissenting.

The primary issues on this appeal are (1) whether the trial

court abused its discretion in striking the testimony of the plaintiffs' expert witnesses and (2) whether the trial court erred in directing a verdict for the defendants. The plaintiffs' case is dependent upon their experts' testimony. Because the trial court did not abuse its discretion in striking that testimony, it was proper to direct a verdict for the defendants.

The majority opinion begins by setting forth the rule, "Expert testimony should be stricken if it appears that the witness is not in possession of such facts as will enable him to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture." This statement of the rule is in accord with the previous decisions of this court, including *Priest v. McConnell, ante* p. 328, 363 N.W.2d 173 (1985). However, the majority's application of the rule cannot be reconciled with this court's application of the rule in previous cases.

At trial the plaintiffs' expert witnesses were permitted to testify that, in their opinion, Peterson became spatially disoriented upon takeoff and lost control of the aircraft. Specifically, George Poullos testified by deposition: "So, with no visual reference whatsoever, and presuming that he did not believe his instruments, if he was looking at his instruments, I'm of the opinion he suffered vertigo, spatial disorientation."

In order to reach their conclusions, the expert witnesses had to assume the existence of a number of elements. Indeed, the only *facts* proven were that a twin-engine plane, allegedly piloted by Peterson, departed from runway 32 of the Columbus, Nebraska, airport at about 7 p.m. on November 25, 1979; that, 14 hours later, the plane's wreckage was found 2 miles northeast of the airport; and that the plane crashed at a 60° nosedown position while headed to the southwest. In the majority opinion, the summation is made: "The experts testified that the location of impact and the angle of impact were *consistent with the theory* of a pilot suffering spatial disorientation and not being able to maintain control of the aircraft." (Emphasis supplied.) To reach the conclusion propounded by the experts, it must be assumed that the plane crashed just after takeoff, at the position and location found, because Peterson made an improper right turn; that in doing so

he encountered a "black hole," that is, nonvisual flying conditions; that he was forced to fly according to his instruments (IFR); and that he was incapable of flying IFR. It is only at this point that spatial disorientation and its counterpart, loss of control of the airplane, become viable theories.

Although the facts known may be "consistent with" a particular theory as to how the accident happened, that will not support a finding that the accident happened in that way. Such evidence generally is not relevant, and testimony to that effect should not be received. *Priest v. McConnell, supra.* As was stated in *Priest*, and has been the underlying reason for disallowing expert testimony in prior decisions of this court, "there is a vast difference between permitting an expert to give an opinion when all the factors necessary to draw a conclusion are in evidence and in permitting an explanation based on assumptions that have no adequate foundation in the evidence." *Id.* at 355, 363 N.W.2d at 177. This rationale, for instance, was also demonstrated in *Flory v. Holtz*, 176 Neb. 531, 126 N.W.2d 686 (1964). Concluding that the factors on which the opinion sought to be elicited were based were too conjectural, this court disallowed the testimony, stating:

> We are in the realm of pure speculation. The testimony is dependent upon too many assumptions. We should not confuse inferences drawn from facts and inferences which are based upon mere assumptions. There is a vast difference between permitting an expert to give an opinion when all of the factors necessary to base an estimate of minimum speed are present and in permitting an estimate of actual speed based on assumptions that have no adequate foundation in the evidence. The apparent competency of the expert would merely aggravate the error.

*Id.* at 539, 126 N.W.2d at 692. Accord *Nickal v. Phinney*, 207 Neb. 281, 298 N.W.2d 360 (1980).

Expert testimony is permitted by Neb. Rev. Stat. §§ 27-702 and 27-703 (Reissue 1979). "However, these rules do not permit either an expert or a lay witness to render an opinion based upon obvious speculation or conjecture." *State v. Johnson*, 215 Neb. 391, 394, 338 N.W.2d 769, 771 (1983).

Furthermore, although Neb. Rev. Stat. § 27-705(1) (Reissue 1979) begins, "The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data," it continues, "The expert may in any event be required to disclose the underlying facts or data on cross-examination." And this court has held that where, on cross-examination, the witness "not only did not disclose such data but affirmatively established that he had no such data," then the opinion testimony should be excluded. *Fletcher v. State*, 216 Neb. 342, 351, 344 N.W.2d 899, 905 (1984). Appropriate to the case at bar is the conclusion reached in *Fletcher*:

> In this case there was no "reconstruction" of an accident that had occurred. Instead, on the flimsy data apparently considered by the witness, an accident was "constructed" or created. The expert gave no reasons for his opinion, and his conclusions are pure speculation and totally insufficient to form a basis for an opinion.

*Id.* at 352, 344 N.W.2d at 905.

The record is replete with examples in which the experts during both direct examination and cross-examination disclosed that their theory of how the accident happened was based on a series of assumptions. For instance, George Poullos testified that his theory was "based on . . . especially the black hole." However, it was further elicited on cross-examination that the defendant would have encountered a "black hole" only if he made a right turn upon takeoff. Furthermore, the only explanation Poullos gave for the defendant to have turned right was "expediency," whereas the correct flight pattern called for a left turn. The expert Gary Blessing was to later testify that the possibilities of the plane's turning right, turning left, or traveling straight were equally consistent. Furthermore, the expert Gregory Gorak testified:

> A. There is some evidence to support a partial turn, but where we got mixed up with each other is you now bring in the low altitude turn and the fact that the aircraft was heading a different heading other than runway takeoff heading, there obviously was some maneuver involved. Whether this maneuver was the result of a turn or a spatial

disorientation, loss of control of the aircraft, I'm not quite sure which transpired. I'm leaning to the spatial disorientation, loss of control.

In fact, when asked, "Mr. Gorak, do you know whether or not the aircraft turned?" he replied, "No"; and when asked, "You agree that no one knows how this accident happened?" he answered, "No one knows."

Moreover, there was no affirmative evidence to rule out the failure of certain controls. When asked if the artificial horizon might have failed, Delbert Valle testified: "It was destroyed. . . . It was beyond the point of determining whether it failed or whether it did not fail." Similarly, no one could rule out other possible causes of the accident, including someone manipulating the dual controls of the airplane.

The cross-examination also revealed that VFR conditions existed in the entire space of the flight and that Peterson was "perfectly legal" to take off. Additionally, the experts admitted that it was impossible to know whether Peterson ever went on his instruments. Rather, Blessing affirmed that an instrument rating or currency was not required for Peterson to take off, and Poullos was unwilling to testify that Peterson's failure to have taken a biennial flight review had anything to do with the accident.

When asked if Peterson could have been an extremely proficient pilot, Blessing admitted, "He could have been anything."

Furthermore, Gorak testified that a vital part of his analysis was that the accident occurred during takeoff. He had not observed the takeoff, and there was no proof that the crash happened during takeoff. There was no evidence of the plane's climb-out speed or the altitude it reached, and Blessing admitted not having an accurate record of the time. Valle testified that the plane's clock had stopped at 2:32.

In short, the record on cross-examination demonstrates that the "facts" used by the experts to support their theory were mere assumptions. In *State v. Miner*, 216 Neb. 309, 312, 343 N.W.2d 899, 902 (1984), this court said: "The ruling of a trial court in receiving or excluding an expert opinion will be reversed on appeal only when a clear abuse of discretion is

shown." In light of the facts, or more appropriately, the lack of facts, in the case at bar, no abuse of discretion has been demonstrated.

This conclusion necessitates a finding that the lower court's order directing a verdict for the defendants should also be affirmed.

The majority sets the tone for its opinion with a quote from *Lange v. Nelson-Ryan Flight Service, Inc.*, 259 Minn. 460, 462, 108 N.W.2d 428, 430 (1961):

> It is a tragic characteristic of airplane crashes that the accident itself frequently destroys all evidence of the cause and kills the witnesses who might have knowledge of the event. Consequently, in litigation arising out of a plane crash the rights of the parties often depend upon the attitude of the court with respect to the right of the jury to draw inferences from such evidence as has survived the disaster.

However, as we stated in *Scarborough v. Aeroservice, Inc.*, 155 Neb. 749, 762, 53 N.W.2d 902, 910 (1952), another airplane crash case:

> The defendants assert that negligence is never presumed and not to be inferred from the mere fact that an accident happened. If the cause of the accident is not ascertained except as a matter of guess, conjecture, or surmise, the defendant would then be entitled to prevail. An abundance of authorities support the above proposition.

In determining whether a directed verdict was appropriate in this case, it is necessary to consider the rule governing circumstantial evidence, which was stated recently in *Anderson v. Farm Bureau Ins. Co., ante* p. 1, 4-5, 360 N.W.2d 488, 490-91 (1985):

> The plaintiffs may establish their case by circumstantial evidence as well as by direct evidence.
>
> However, circumstantial evidence is not sufficient to sustain a verdict depending solely thereon for support, unless the circumstances proved by the evidence are of such nature and so related to each other that the conclusion reached by the jury is the only one that can fairly and reasonably be drawn therefrom. Mullikin v.

Pedersen, 161 Neb. 22, 71 N.W.2d 485.

The evidence must be such as to make the plaintiffs' theory of causation reasonably probable, not merely possible.

In every case, before the evidence is submitted to the jury, there is a preliminary question for the court to decide, when properly raised, not whether there is literally no evidence, but whether there is any evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the burden of proof is imposed. Weston v. Gold & Co., 167 Neb. 692, 94 N.W.2d 380.

Where several inferences are deducible from the facts presented, which inferences are opposed to each other, but equally consistent with the facts proved, the plaintiffs do not sustain their position by a reliance alone on the inferences which would entitle them to recover. Shamblen v. Great Lakes Pipe Line Co., 158 Neb. 752, 64 N.W.2d 728.

Conjecture, speculation, or choice of quantitative possibilities are not proof. There must be something more which would lead a reasoning mind to one conclusion rather than to the other.

Since the experts' testimony was properly stricken, the only conclusion which could be reached was that the plaintiffs failed to produce any evidence upon which a jury could properly find in their favor.

Viewing the evidence in the light most favorable to the plaintiffs demonstrates that they dispelled the possibility of mechanical failures only to the extent that an investigation would disclose them. There was evidence that Peterson had limited nighttime flying experience; that he was not current in his instrument ratings; that he had gone beyond his biennial flight review date; that he was not authorized to fly a plane at night with passengers aboard; that "marginal" visual flight rules conditions existed at the time of takeoff; and that Peterson violated an FAA rule when he did not obtain a preflight weather report. The evidence further established that he took off prior to doing a complete "run-up" and cockpit check, and prior to allowing the engines to reach normal

operating temperatures. There was no evidence as to *when* the crash occurred; whether the plane crashed on takeoff or at some later time when Peterson was returning to the airport; or as to how or why the crash occurred.

The absence of proof of the facts essential to recovery in this case is apparent. Under the standard set forth in *Anderson, supra,* the evidence of negligence was not sufficient to submit the case to a jury. As stated by the trial court: "I've listened to this testimony and the record leaves but one impression: The cause of this accident is unknown."

The judgment of the trial court should have been affirmed.

HASTINGS and CAPORALE, JJ., join in this dissent.